BESSIE D. WILLIAMS, as Executrix of ALBERT WILLIAMS, Deceased, Respondent, v. STATE OF NEW YORK, Appellant. (Claim No. 30880.)

Argued February 28, 1955; decided June 2, 1955.

*Jacob K. Javits*, Attorney-General (*John R. Davison* and *Henry S. Manley* of counsel), for appellant. I. Nothing the State did or did not do was the proximate cause of decedent's death. (*Flaherty* v. *State of New York*, 296 N. Y. 342; *Excelsior Ins. Co. of N. Y.* v. *State of New York*, 296 N. Y. 40; *St. George* v. *State of New York*, 283 App. Div. 245, 308 N. Y. 681; *Weihs* v. *State of New York*, 267 App. Div. 233; *Saugerties Bank* v. *Delaware & Hudson Co.*, 236 N. Y. 425; *Ragone* v. *State of New York*, 123 Misc. 48, 211 App. Div. 573, 243 N. Y. 607; *Mars* v. *Delaware & Hudson Canal Co.*, 54 Hun 625; *Scolavino* v. *State of New York*, 297 N. Y. 460; *Jones* v. *State of New York*, 267 App. Div. 254; *Mitchell* v. *Rochester Ry. Co.*, 151 N. Y. 107.) II. The law of *Mitchell* v. *Rochester Ry. Co.* (151 N. Y. 107) that " plaintiff cannot recover for injuries occasioned by fright, if there was no immediate personal injury " has never before been overruled, and the considerations of public policy that prompted that holding are as pertinent and sound today as they were then. (*Comstock* v. *Wilson*, 257 N. Y. 231; *Beck* v. *Libraro*, 220 App. Div. 547; *Balestrero* v. *Prudential Ins. Co. of America*, 307 N. Y. 709.) III. There is no legally acceptable proof that decedent was assaulted. (*Wank* v. *Ambrosino*, 307 N. Y. 321; *Cox* v. *State of New York*, 282 App. Div. 815.) IV. The findings of negligence on the part of the State are contrary to the evidence.

*Louis Young* and *Alan J. Flattery* for respondent.   I. The State of New York, its agents and servants, were negligent in the operation and management of Auburn State Prison farm. (*Starling Realty Corp.* v. *State of New York,* 286 N. Y. 272.) II. The State of New York is responsible for the consequences of Kennedy's escape.   (*Excelsior Ins. Co. of N. Y.* v. *State of New York,* 296 N. Y. 40; *Flaherty* v. *State of New York,* 296 N. Y. 342; *Scolavino* v. *State of New York,* 297 N. Y. 460; *Jones* v. *State of New York,* 267 App. Div. 254; *Weihs* v. *State of New York,* 267 App. Div. 233; *Palsgraf* v. *Long Is. R. R. Co.,* 248 N. Y. 339; *Hogan* v. *Comac Sales,* 245 App. Div. 216, 271 N. Y. 562; *Daly* v. *State of New York,* 226 App. Div. 154; *Foley* v. *State of New York,* 294 N. Y. 275; *O'Neill* v. *City of Port Jervis,* 253 N. Y. 423.)   III. Albert Williams' death was caused by the convict Kennedy's force and threats in attempting to perfect his escape.   (*Tortora* v. *State of New York,* 269 N. Y. 167; *Moller* v. *Pickard,* 232 N. Y. 271; *Aerated Products Co.* v. *Godfrey,* 290 N. Y. 92; *Emigrant Ind. Bank* v. *Willow Builders,* 290 N. Y. 133; *Ingersoll* v. *Liberty Bank of Buffalo,* 278 N. Y. 1; *Rosenberg* v. *Schwartz,* 260 N. Y. 162; *White* v. *Lehigh Valley R. R. Co.,* 220 N. Y. 131.)   IV. Dr. Dolan's evidence as to the history obtained from the deceased was properly received.   (*Davidson* v. *Cornell,* 132 N. Y. 228; *Meany* v. *United States,* 112 F. 2d 538; *People* v. *Del Vermo,* 192 N. Y. 470; *Greener* v. *General Elec. Co.,* 209 N. Y. 135; *People* v. *Sprague,* 217 N. Y. 373; *People* v. *Curtis,* 225 N. Y. 519; *Handel* v. *New York R. T. Corp.,* 252 App. Div. 142; *Noseworthy* v. *City of New York,* 298 N. Y. 76; *Brott* v. *Auburn & Syracuse Elec. R. R. Co.,* 220 N. Y. 92; *Sackheim* v. *Pigueron,* 215 N. Y. 62; *Trimble* v. *City of New York,* 275 App. Div. 169; *Bailey* v. *Bethlehem Steel Co.,* 277 App. Div. 798, 302 N. Y. 717.) V. The law of *Mitchell* v. *Rochester Ry. Co.* (151 N. Y. 107) should not bar recovery here.   (*Hack* v. *Dady,* 142 App. Div. 510; *Williams* v. *Underhill,* 63 App. Div. 223; *Beck* v. *Libraro,* 220 App. Div. 547; *Stahl* v. *William Necker, Inc.,* 184 App. Div. 85; *Spade* v. *Lynn & Boston R. R. Co.,* 168 Mass. 285; *Homans* v. *Boston El. Ry.,* 180 Mass. 456; *Hickey* v. *Welch,* 91 Mo. App. 4; *Comstock* v. *Wilson,* 257 N. Y. 231.)

FROESSEL, J. A judgment of $16,826.30 has been awarded to the respondent, executrix of one Albert Williams, who died of a brain hemorrhage brought on by fright when one William Kennedy, a convict, escaped from the Auburn prison farm and induced Williams to drive him to Syracuse in Williams' truck. The Appellate Division has affirmed by a divided court.

Kennedy, prior to the time in question, had been convicted of attempted robbery, third degree, the charge specifying that he " with armed accomplice robbed taxi driver of money and watch at night ". The accomplice was his brother, the amount taken $12, and the armed weapon was a toy pistol. He was received at Elmira Reformatory in December, 1948, and paroled in July, 1950. One month later he was returned to prison for violating his parole, and was then transferred to Auburn State Prison late in August. He would have been eligible for parole board consideration again nearly two years later, in July, 1952. In the ensuing eight months at Auburn, he was punished four times (with forfeitures of " good time ") for violations of prison discipline. These violations, however, were found to be of a " minor nature ", involving horseplay in the dining room, splashing water, wasting four slices of bread, and refusing to co-operate with the guard assigned to awaken prisoners in the morning.

On April 21, 1951, Kennedy, having previously been declared eligible for outside work " in accordance with the administrative rules of the prison ", was assigned to the State prison farm at Sennett, about four miles east of Auburn Prison, with a group of other prisoners and guards. The prison farm system is authorized by section 182 of the Correction Law. At the prison farm, prisoners are supervised under conditions of " minimum security ". This practice of relaxing security restrictions at prison farms is " proper and approved " in this State, and eligibility for such work is determined by the principal keeper of the prison.

As afore-mentioned, on April 21, 1951, a little over a year before he would again become eligible for parole, Kennedy was among twenty-five prisoners assigned to the farm and was, with seven other prisoners, working under the supervision of one of the two guards on duty there that day. Both guards were unarmed. The prison farm is not fenced and there are no

pickets, towers or lookouts. At times the prisoners were allowed to work out of the view of the guards. At about 12:30 P.M. that day, the guard in charge of Kennedy's group went to another part of the farm and remained out of sight for fifteen minutes. When he returned, Kennedy was missing.

The farm is located on a road leading to Route 20, the highway between Auburn and Skaneateles. There was a siren on the farm which, on occasions of previous escapes, had been sounded there and heard in Skaneateles. There was also a prison escape plan for the staff of Auburn Prison, which included the establishment of certain designated road blocks in the area, one of which was at the junction of County Line Road and Route 20, a point three miles east of the prison farm. The prison farm's siren was not sounded, but the main prison siren was blown with reasonable promptness. One hour and fifteen minutes after the escape, a man later identified as Kennedy was observed at the afore-mentioned intersection, but no road block was seen there at that time.

The trial court found that, at about 2:00 P.M., the escaped prisoner, "by use of force, threats and duress", compelled Albert Williams, a local farmer, to "drive and transport" him "in attempting to perfect his escape". At about 2:20 P.M., Williams and a man later identified as Kennedy were seen driving easterly in Williams' truck on Route 20 betweeen Williams' home and Skaneateles. They halted for "10, 20 or 30 seconds" in front of a gas station, where a witness, one Donald Clark, could see that Williams "was sort of gesturing with his hands" before they drove on.

At about 2:30 P.M., some ten minutes later, another witness who had known Williams for twenty-five years and had personal knowledge of Williams' ordinary manner of driving his truck, saw that truck going easterly toward Syracuse from Marcellus at a "fast rate of speed"—"probably 45 or 50"—with Williams "hanging onto the wheel". A man was seated beside him whom the witness did not recognize.

At 3:15 P.M., Williams was found in Marcellus sitting on the running board of his truck which was headed in the direction of Skaneateles. He had been vomiting and was apparently very ill. An ambulance was called and he was taken to the hospital. The afore-mentioned "force, threats and duress" and "emotional

stress " which Kennedy caused Williams to endure " caused a hemorrhage of his brain " from which he died the next day.

Kennedy was apprehended by a police officer in Syracuse at about 5:30 p.m., the same day of the escape. He was carrying a sweater which Williams had been wearing earlier in the day and a sharp blade, six inches long, which had been part of a farm implement of a type that could have been taken from any of several machines or junk piles on the prison farm.

An autopsy revealed no bruises or other signs of trauma upon Williams' body, and there was no proof that Kennedy had committed any battery upon Williams. The trial court so found, and noted that " the record is devoid of a showing of physical impact contributing to the fright which resulted in Williams' death." It also concluded that " the negligence of the State of New York in permitting Kennedy to escape and in failing diligently to search for him was the proximate cause of the conscious pain and suffering and of the death of Albert Williams."

The courts below have thus found that the State was negligent in *guarding* and *apprehending* Kennedy, and that the latter, by forcing Williams to drive him to Syracuse, frightened Williams and caused his fatal brain hemorrhage. Both the findings of negligence on the part of the State and of Kennedy's responsibility for Williams' death have support in the record before us. Nevertheless, the judgment below must be reversed and the claim dismissed, for, even where negligence and injury are both properly found, the negligent party can be liable only where the negligence charged was the proximate cause of the injury received. The Court of Claims has found proximate causation here, but this, we hold, was error.

At the outset, it might be noted that this is not the case of an *escaped convict being sued* for the consequences of *his willful assault* upon another. Were this such a case, a valid cause of action would lie (*Preiser v. Wielandt,* 48 App. Div. 569; *Williams v. Underhill,* 63 App. Div. 223; see *Garrison v. Sun Print. & Pub. Assn.,* 207 N. Y. 1, 8). Neither is this the case of the State being sued on the theory of *respondeat superior* for the injuries inflicted by Kennedy, since the relationship of jailer and prisoner can hardly be analyzed in agency terms. Indeed, the trial court found that " *Respondeat superior* does not apply as between Kennedy and this defendant ". Here the State as jailer was at

most negligent, and the escaped convict wanton and assaultive, each apart from the other. Having these two separate concepts in mind, and lacking any agency or other relationship permitting vicarious liability, it follows that proximate cause must stem from the State's acts rather than Kennedy's, if liability is to run against the State. Stated otherwise, if a plaintiff proves negligence by a defendant and injury to himself, but fails to prove that the former was the legal, or proximate, cause of the latter, he simply fails to establish his case. Even though the defendant were negligent, it is, at best, " negligence in the air ", and thus the State may not be held accountable for claimant's damage (*Martin* v. *Herzog,* 228 N. Y. 164, 170).

*Palsgraf* v. *Long Is. R. R. Co.* (248 N. Y. 339) lends guidance in evaluating the proximate causal factor in a given fact situation. While it illustrates the difficulty of applying any general rule to a unique set of circumstances, it does suggest the only available co-ordinates — duty and foreseeability. As Judge CRANE put it in *O'Neill* v. *City of Port Jervis* (253 N. Y. 423, 433), there can be no liability for a " negligent " act unless there existed " a reasonable likelihood of danger as a consequence of the act complained of ". It is this likelihood of danger, or, as Chief Judge CARDOZO declared in the *Palsgraf* case (*supra,* at p. 344), this " risk reasonably to be perceived ", which defines the *duty* " to be obeyed " in each situation.

With the above construct before us, did the State, *qua* jailer, owe to Williams, as a private citizen, the particular duty of preventing the escapee here involved from committing the assault which frightened Williams to death? To begin with, it will be helpful to compare the duty to guard the public from escaped prisoners with that of protecting it from the inmates of mental hospitals.

The State has frequently been held liable for the consequences of its breach of duty to protect others from the acts of the mentally ill confined to State institutions (*Scolavino* v. *State of New York,* 297 N. Y. 460; *Weihs* v. *State of New York,* 267 App. Div. 233; *Jones* v. *State of New York,* 267 App. Div. 254; *Joachim* v. *State of New York,* 180 Misc. 963; *Curley* v. *State of New York,* 148 Misc. 336, affd. *sub nom. Luke* v. *State of New York,* 253 App. Div. 783, and see *Martindale* v. *State of New York,* 269 N. Y. 554; *Dow* v. *State of New York,* 183 Misc. 674). In

such cases, where the confinement is not in the nature of *punishment,* but rather of *restraint* and, where possible, cure, there is both a duty to the inmate to provide him with reasonable rehabilitational conditions under the circumstances and to the outside public to restrain the dangerous, or potentially dangerous, so that they may not harm others. Between the two " contending interests ", it has been said, " A balance must be struck " (*Excelsior Ins. Co. of N. Y.* v. *State of New York,* 296 N. Y. 40, 46). The risks to be perceived with the mentally ill who are irresponsible defines the State's duty to protect others from them.

Kennedy, by contrast, was not a psychiatric patient; indeed, an examination by the prison psychiatrist in February, 1950, found no indication of psychosis — the worst that could be said of him in that report was that he was " socially maladjusted ". Nor was Auburn Prison in any sense a mental institution or hospital. If the jailer owes a duty to the outside world with regard to the sane persons who have been placed in his custody for a variety of illegal activities, it is to assure the public that such criminals will remain in his care until, by the course of time or a proper legal determination, they have been declared free of their debts to society. *Restraint* and *punishment* must be distinguished here. In the instant case, the convict who was allowed to escape had been imprisoned for a *toy* pistol holdup, and had a relatively tranquil record while in prison. From nothing in the record and exhibits below can we derive any basis for the foreseeability of his conduct toward Williams.

Despite the Court of Claims' technically accurate description of the original toy pistol robbery as a " crime of violence ", it was not, realistically speaking, the act of a desperado inveterately given to assault or violence. At worst, if we study the account of the crime in Kennedy's " Pre-Classification Report " at Elmira Reformatory, it appears to have been the act of an " unemployed and homeless " young man committed after he " had been drinking a great deal ". Although these details do not alter the fact that Kennedy committed a crime for which the State was entitled to impose imprisonment, they do indicate that the so-called " crime of violence " for which he was imprisoned could not be said to have foreshadowed Kennedy's alleged assault upon Williams.

Certainly Kennedy's violation of parole in August, 1950, for which he was returned to prison and then transferred to Auburn Prison, gave no indication of future violence — the violation being merely failure to report weekly to the parole officer. Nor can the violations of prison discipline for which Kennedy was punished while in Auburn Prison be said to have provided such foreseeability for, as even the Court of Claims has conceded, they were " of minor nature ". All things considered, it can hardly be said that the State owed a duty to members of the public to protect them from the risk of exposure to such a man.

Unlike a mental patient, Kennedy was being *punished,* and for that reason deprived of his liberty. Thus, if the State negligently permitted Kennedy's premature return to society, it breached only that *public* duty *to punish,* a duty owed to the members of the community collectively but importing no " crushing burden " of liability to individuals for the breach thereof (see *Steitz* v. *City of Beacon,* 295 N. Y. 51, 54–55). If it was a wrong, it was not a wrong to Williams, for, as to him, the breach of duty or wrong did not carry with it " possibilities of danger " (*Palsgraf* case, 248 N. Y. 339, *supra,* p. 345); the assault or threatened force upon him was not " The risk reasonably to be perceived " (*id.,* p. 344). As to Williams, the State's claimed carelessness was " negligence in the air " or " in the abstract " (*Palsgraf* v. *Long Island R. R. Co., supra,* at pp. 341, 345), and was not joined to his death by the element of foreseeability. His death therefore may not be included within the class of consequences of the State's negligence for which it must answer in damages (see *Paglia* v. *State of New York,* 278 App. Div. 281, affd. 303 N. Y. 821).

Of course, to be liable, the State need not have been required to foresee the exact manner in which its negligence will result in injury, but merely that some injury will result therefrom (*Lowery* v. *Manhattan Ry. Co.,* 99 N. Y. 158, 162–163). Here, nothing in Kennedy's record, his psychiatric history or his prison experience, gave any indication that he was likely to wander from the prison and assault members of the public. It is of some note that the Court of Claims found no fault or negligence in the fact that a man with Kennedy's background was assigned to " minimum security " farm work " in accordance with the administrative rules of the prison ", an assignment

which is regarded by the prisoners as a " privilege " accorded only those few [here, 25 out of 1,600] whose records merit the lowered security restrictions of the outside work gangs.

As we said in *Flaherty* v. *State of New York* (296 N. Y. 342, at p. 346), where we reversed a holding that the State was liable for the attack of one reformatory inmate upon another, " The law is clear; it is only in its application that difficulty is encountered.  The State — just as any other party (Court of Claims Act, § 8; L. 1939, ch. 860) — is responsible, in the operation of its schools, hospitals and other institutions, only for hazards reasonably to be foreseen, only for risks reasonably to be perceived." That rule cannot be reconciled with the judgment below.

That Williams was frightened to death by Kennedy's willful acts may be conceded.  This does not mean, however, that the State is liable for its alleged negligence in the absence of foreseeability, which " defines the duty to be obeyed ". Without duty, there can be no breach of duty, and without breach of duty there can be no liability.

But, even beyond the fact that fundamental legal principles will not permit affirmance here, public policy also requires that the State be not held liable.  To hold otherwise would impose a heavy responsibility upon the State, or dissuade the wardens and principal keepers of our prison system from continued experimentation with " minimum security " work details — which provide a means for encouraging better-risk prisoners to exercise their senses of responsibility and honor and so prepare themselves for their eventual return to society.  Since 1917, the Legislature has expressly provided for out-of-prison work (Correction Law, § 182), and its intention should be respected without fostering the reluctance of prison officials to assign eligible men to minimum security work, lest they thereby give rise to costly claims against the State, or indeed inducing the State itself to terminate this " salutary procedure " looking toward rehabilitation (*Excelsior Ins. Co. of N. Y.* v. *State of New York, supra*, 296 N. Y., at p. 46).  Kennedy was chosen with a small, specially selected group of trusted men, who, in a sense, on the basis of their good records, were given a limited form of liberty, less than parole, under " minimum security ", which

the trial court found " is a proper and approved prison practice in the State of New York ".

Certainly there is no merit to the contention that prisons will become more carelessly guarded by a holding of nonliability here. In view of the duties which the Legislature has imposed upon jailers to apprehend escaped prisoners (Correction Law, §§ 132, 284, 340) and the disciplinary measures which careless prison guards must face (Employees Rule Book, N. Y. State Dept. of Correction, § 376, adopted pursuant to Correction Law, § 112), such fears are unwarranted.

The State, relying on *Mitchell* v. *Rochester Ry. Co.* (151 N. Y. 107), also urges that it cannot be liable for the particular injury here involved — the hemorrhage due to fright — and resulting in death, where, as the courts below have found, there was no showing that Kennedy committed a battery, or otherwise produced an impact, upon the person of Williams. In the absence of any proximate causation between the State's act and Williams' death, we do not reach this question.

The judgment of the Appellate Division and that of the Court of Claims should be reversed and the claim dismissed, without costs.

CONWAY, Ch. J., DESMOND, DYE, FULD, VAN VOORHIS and BURKE, JJ., concur.

Judgments reversed, etc.