Caroline K. Simon, J.
On May 27,1963 Mr. Sam Wasserstein, the claimant in this action for permanent personal injuries, was on his way home from his evening employment. It was between 9:30 and 9:45 p.m. on a Monday evening as Mr. Wasserstein, then 48 years old and in good physical health, proceeded on foot along Eastern Parkway near Buffalo Avenue in Brooklyn.
He had parked his car at Buffalo Avenue in a lighted area and had gone to purchase cigarettes and a newspaper after having concluded his work as a clothing salesman in the second of his two daily jobs. He was accosted by one of a trio of teenage boys who asked him for a nickel. Immediately thereafter, Mr. Wasserstein testified, he felt something hit him in the head and experienced a blinding flash from a shot in the temple and a bullet which destroyed the sight of both eyes. Claimant called for help and, since he could not see, he sat on a curb until the ambulance came and took him to Kings County Hospital. He was told the bullet had hit in his left eye. It was removed from his right temple through the right eye.
Permission was granted by another Judge of this court to file the claim two days after the statutory period had expired. Notices of intention to file a claim had been received and filed with the Clerk of the Court of Claims and in the office of the Attorney-General on August 27, 1963 and the claim itself was filed in both places on May 21,1965. It has neither been assigned, nor tried, nor brought before any other court or tribunal for determination.
Mr. Wasserstein alleges negligence of the State of New York in releasing 15-year-old Harold Carter, his assailant, from Warwick State School. He further charges the State with carelessness in its failure properly to supervise a previously adjudged juvenile delinquent who had been sentenced as an incorrigible and subsequently placed on parole.
Harold Carter, one of six children, was born in Brooklyn on February 21, 1948. The other five children were girls. All six children were born out of wedlock. The mother was unmarried, unemployed, and receiving welfare assistance. Harold’s early schooling was marked by frequent absences.
On April 26,1960 Mr. Carter was committed to a State Training School as an incorrigible. He was paroled on September 8, 1961 and was returned to the school on April 6, 1962. He was absent from school without leave from August 10 until October 26, when he was again returned to the school. He was paroled on March 18,1963.
A youth parole worker employed by the Home Service Bureau testified that he interviewed Mrs. Carter at her home and deter *227 mined that Harold should he paroled to her custody. He stated that he had arranged for the boy to be entered in a different public school in order to prevent his reassociation with street gangs. He considered that Harold was making a good adjustment until he learned on May 24,1963 that the boy was a truant from home and school. He arranged for the issuance of a warrant of arrest on May 27, the day claimant was shot.
At the trial the parole officer gave two dates as the arrest date — once testifying it was May 27, 1963 and later that it was May 26, 1963. No copy of the warrant of arrest was introduced, but it is unrefuted that the warrant was issued before the shooting.
On May 27, 1963 a police officer on motor patrol received a message that a man had been shot at Eastern Parkway and Buffalo Avenue and that three youths had fled the scene. He approached Buffalo Avenue and saw three teenagers on Prospect Place, two sitting on a milk box and one standing. He stopped the radio car and told his partner to apprehend the youth who was starting to walk across the street, while he went after the two on the milk box.
All three youngsters were arrested. The officer testified that he knew them by sight, having seen them in the neighborhood many times before, and having been furnished with descriptions fitting them by victims and witnesses of a number of previous assaults and robberies of stores during the two months prior to this shooting. Mr. Carter admitted his guilt to the arresting officer and again at the police station. He was returned to the scene of the crime where he re-enacted the event.
Later the District Attorney brought boys into the hospital but claimant did not recognize the voices and testified to having no knowledge of the perpetrator.
The policeman took 15-year-old Mr. Carter to Children’s Court where the boy pleaded guilty to the shooting. The officer also stated that he appeared and testified in a Supreme Court trial of the other two boys, and that he heard Carter testify in the-latter trial as to the identity and ownership of the gun and the manner in which he acquired possession of it.
After having pleaded guilty of juvenile delinquency, and having been sent to Elmira Reformatory, Harold Carter subsequently died of multiple stab wounds on September 17,1966.
Claimant’s attorney offered into evidence as Exhibits Nos. 8 and 9 portions of the official transcript of a criminal trial in Kings County held April 3,1964 (Docket No. 1969/1963) involving two of Carter’s associates as well as the 14-page transcript of the sentencing of these two individuals before the same Supreme Court Judge on April 3,1964.
*228 The offer was challenged by the State as violating the hearsay evidence rule. Claimant’s counsel contended that this offer fell within one of the exceptions to the hearsay rule, citing CPLR 4517, as well as Healy v. Rennert (9 N Y 2d 202) and Fleury v. Edwards (14N Y2d334).
In Fleury v. Edwards (cited supra) beginning at page 338 Chief Judge Desmond states: “ Everything seems to favor a holding that such former testimony of a now deceased witness should be taken when it was given under oath, referred to the same subject-matter, and was heard in a tribunal where the other side was represented and allowed to cross-examine. The 1958 report of the legislative commission which prepared the new CPLR said this: ‘ The prior testimony exception to the hearsay rule offers the maximum guarantee of trustworthiness since the original statement was made in court, under oath and subject to cross-examination by a party who had the same motive to expose falsehood and inaccuracy as does the opponent in the trial where the testimony is sought to be used. ’ ” In Judge Fold’s’ concurring opinion (p. 341) he states: “The common law of evidence is constantly being refashioned by the courts of this and other jurisdictions to meet the demands of modern litigation. Exceptions to the hearsay rules are being broadened and created where necessary * * * Absent some strong public policy or a clear act of pre-emption by the Legislature, rules of evidence should be fashioned to further, not frustrate, the truth-finding function of the courts in civil cases.”
The court believes the instant set of facts Avarrants regarding the trial excerpts and the sentencing transcript as exceptions to the hearsay evidence rule. Carter Avas tried in Children’s Court because of his age, although he actually was a party to the whole chain of circumstances. His trial in the Children’s Court in a setting intended to mobilize the forces of social rehabilitation does not alter the true nature of the interplay among the three culprits.
The combination of events by which Carter became a witness in the criminal trial of íavo accomplices Avhich involved the same crime, and at Avhich trial Mr. Carter Avas represented by counsel Avith the right to cross-examine as entitled to him under section 8 of the Code of Criminal Procedure, places the Carter testimony within the exception to the hearsay evidence rule.
Were further support needed for not permitting the hearsay evidence rule to hamper the search for truth in a lawsuit, it is supplied by the lead article in the March, 1968 issue of the American Bar Association Journal entitled: ‘ ‘ The Hearsay Rule and the Docket Crisis: The Futile Search for Paradise ” by Judge *229 Talbot Smith of the Federal District Court for the Eastern District of Michigan. (Vol. 54, p. 231 et seq.)
It is the court’s finding that the reasonable interpretation intended for CPLR 4517 and the interests of justice warranted the acceptance of Exhibits 8 and 9 into evidence.
Judgment as to whether Mr. Carter was ready for parole is a judgment as to which this court makes no comment.
The court recognizes as quasi-judicial the determination that Mr. Carter should have been paroled, as the law permits if certain conditions exist, and therefore does not review it. The question the court does have before it is whether the State was negligent in its supervision and control of the parolee.
The court regards parole as an important effective technique in the rehabilitation of those who have been imprisoned. However, the facts in the instant case demonstrate that the State was negligent in its supervision of Mr. Carter’s parole.
The law requires that: “ If the parole officer having charge of a paroled prisoner * * * shall have reasonable cause to believe that such prisoner has lapsed, or is probably about to lapse, into criminal ways or company, or has violated the conditions of his parole in an important respect, such parole officer shall report such fact to a member of the board of parole or to any officer of the division of parole designated by such board, who thereupon may issue a warrant for the retaking of such prisoner and for his temporary detention or return to a designated prison.” (Correction Law, § 216.)
Carter’s parole officer found him to be conducting himself in the manner described in section 216. If he had, in accordance with outlined procedures, expeditiously brought Carter into custody protective of him and society, it is tragically true that claimant might now have his sight. ‘ ‘ The statute requires expedition by the Parole Board in retaking parolee where there is reasonable cause to believe there has been such a violation * * * The discretionary powers given the board should at all times be exercised with great care, caution and diligence.” (People ex rel. Lanza v. Jackson, 7 A D 2d 782, 783.)
Living at home was one of the terms set for Mr. Carter by the parole officer. Nevertheless, when to the officer’s knowledge, Harold Carter had been absent from home a week and he and the parole officer had a chance meeting on the street but Mr. Carter ran away when the officer called to him, the parole officer did not report him as a parole violator to Warwick.
School attendance was another parole requirement which Mr. Carter breached, but the parole officer did not report until two days after he knew of it the fact of Mr. Carter’s having been a *230 school truant for 9½ days out of a possible 21 attendance days. On May 24,1963 the officer notified police to pick up Mr. Carter. The Home Service Bureau finally, on May 26, 1963 issued a warrant to return Mr. Carter to Warwick.
The court finds the facts to be that Mr. Carter had been away from home without permission, and was living and consorting with persons known to be antisocial and from whom, or in whose house, he obtained the gun used in the shooting.
The facts in the instant matter demonstrate that the State was negligent in its supervision of Mr. Carter’s parole. This negligence was the proximate cause of claimant’s injury.
In Daggett v. Keshner (284 App. Div. 733, 739) Judge Breitel stated: ‘ ‘ There was a recognizably practical connection between the illegal sale of the gasoline and the explosion in this case, and but for that illegal sale the accident, in a realistic and recognizable sense, would not have occurred.”
Though in that case proximate cause was established by the violation of a statute, there is a similarity to the instant claim since, if the violator of parole had been expeditiously incarcerated as the law requires, the subsequent criminal act could not have occurred.
The situation is unlike that in Williams v. State of New York (308 N. Y. 548, 554) since in the instant claim the parole officer, by ordering the reincarceration of Mr. Carter as a parole violator, was finding him unsuitable to be out of the reformatory and therefore recognized there was a “ reasonable likelihood of danger ” as a consequence of permitting him to remain at liberty. After making that determination the failure expeditiously to arrest and incarcerate Mr. Carter was negligence from which the horrendous incident flowed.
Claimant will be 54 years old on August 28, 1968. He was 48 years old on the assault date. According to life expectancy tables (Table No. 3, Insurance Law Appendix) he had a reasonable life expectancy of 25.27 years, though his work life could have been expected to be shorter. He is married and the father of two sons, one 14 years old and the other 22 years old at the date of the injury, and both then at school. The older son was studying dentistry when his father was injured.
At the time of the assault, claimant was earning $200 per week by working at two jobs: one as a presser at which type of work he had been employed by two firms during the past 25 years, and the other, after hours, as a men’s clothing salesman for 25 years making an additional $50 to $60 per week. For a short period claimant had gone into business for himself. His wife *231 was then a housewife and not gainfully employed outside their home.
Claimant has not seen since his injury, despite examinations and treatments by many eminent doctors, some of whom charged claimant no fees. Claimant now wears dark glasses to cover his eyes, which the court viewed at his counsel’s request, and noted to be obviously not normal.
Claimant has not worked since the injury. After his hospital stay, his eyes were treated medically for an ulcerated condition. Sedation was prescribed and hot compresses and ointment were ordered and used for six months at home. Mr. Wasserstein never had any eye trouble before the shooting, and wore glasses only for reading.
Mr. Wasserstein’s medical expenses were $875, a reasonable figure for the services received. His hospital bill for an 11-day stay was $300.
On the evidence adduced, the court finds the proximate cause of claimant’s injury to be the State’s failure to take Mr. Carter into custody as a parole violator when he was found to be so. The State had notice that Mr. Carter was consorting with those known to have antisocial conduct patterns from which aggressive action could flow.
Having determined Mr. Carter to be unsuitable for further parole, it was the clear and definite obligation of the State’s parole officer to expeditiously terminate the parole and place the parole violator in custody. This was not done and the fact that it was not done is the proximate cause of claimant’s injury.
Damages cannot restore claimant’s sight but hopefully can compensate to a degree for lost earnings as well as the medical and hospital costs.
For his pain and suffering, permanent incurable damage, curtailment of earnings, and medical and hospital expenses, the court awards claimant the total sum of $110,000.
The motion to dismiss the claim against the State for negligence in paroling Mr. Carter, made by the State after claimant rested, and on which decision was reserved, is granted. The motions made to dismiss the claim alleging negligence in the supervision of Mr. Carter, and for failure to prove a prime facie case, on which decision was also reserved, now are denied.