John Carroll Young, J.
These claims, for personal injuries sustained by Angela I. Jansen, and the derivative claim of her husband, Gunter Jansen, for loss of her services and consortium and for medical expenses, were duly filed and served on the Attorney-General on May 6,1964.
The claims are based on alleged negligence of certain members of the New York State Police as hereinafter mentioned, in the operation of State Police vehicles while in the process of apprehending a suspected criminal who was operating a 1951 Buick automobile reported to the police to have been a stolen vehicle.
The accident out of which these claims arose occurred on *37 February 14,1964 at about 11:55 p.m. on a State highway known as Route 11; at the point where the accident happened, northbound and southbound traffic are divided into separate lanes by a mall; the place of this accident was just north of a traffic interchange known as Northern Lights Traffic Circle in the County of Onondaga, New York. Claimant Angela I. Jansen, at the time of such accident, was the operator of a 1961 Buick convertible automobile owned by her husband, claimant Gunter Jansen, which she had been driving northerly on said Route 11 intending to turn to her left on Bailey Road and to proceed westerly on Bailey Road toward her home; Bailey Road intersects Route 11 from the west at a point just north of where her vehicle had been brought to a stop. She had stopped in obedience to a traffic light controlling northbound traffic at this point and was in the left-hand lane of the two lanes, provided for any northbound traffic, intending to turn left into Bailey Road from said Route 11.
While her vehicle was standing in this position, which she described as approximately two feet from the left-hand curb line and with the front of her car near the northerly tip of the traffic island separating the north and southbound lanes of Route 11, a position in which she remained stopped for about 30 seconds, she testified that (from a distance of 600 or 700 feet) she observed three pairs of headlights coming toward her, side by side. Of these vehicles, it developed that the one in the center was the stolen 1951 Buick and on each side thereof was a State Police car operated by a member of the New York State Police.
As these vehicles came toward the Jansen car and approached the point where the southbound traffic is required to go to the right or westerly side of the traffic island, the stolen vehicle was turned to its left and collided with the State Police vehicle on that side; both these vehicles then turned to the left or easterly side of such traffic island, into the part of the highway reserved for northbound traffic where the Jansen ear was standing and the stolen vehicle collided violently with the front of the said Jansen vehicle, forced it backward for some distance, and caused claimant Angela I. Jansen to be thrown against various parts of her automobile and to receive severe and painful personal injuries; as a result of these injuries she underwent considerable pain, suffering and disability and was obliged to undergo medical treatment; as a further result claimant Gunter Jansen was deprived of her services and companionship and hás become liable for the payment of her medical treatment.
*38 The series of events which culminated in the said collision out of which these claims arose, commenced at approximately 10:45 p.m. on said evening of February 14, 1964, when Trooper James E. Maring, a member of the New York State Police, received a radio message from the New York State Police substation located at Pulaski, New York, that a 1951 Buick automobile had been stolen. Trooper Maring proceeded to the intersection of Route 11 and Route 13 in the Village of Pulaski, where he stationed himself to watch for the stolen vehicle. Shortly thereafter, he saw the 1951 Buick being driven southbound on Route 11 by a young male operator. After comparing the registration number of this 1951 Buick with the registration number given in the police radio message, he followed the stolen vehicle and halted it in front of a restaurant on the south edge of Pulaski. Trooper Maring, stopped his State Police car behind the Buick, leaving his red light on, and as Trooper Maring started to get out of his vehicle to approach the operator of the Buick, said operator again started off in a southerly direction on Route 11. Route 11 is one of the principal north-south highways through this section of the State of New York, with traffic proceeding both north and south thereon.
Trooper Maring returned to his vehicle and started south in pursuit of the Buick. At this point, Trooper Richard 0. Peck of the New York State Police, was in the process of obtaining gasoline for his State Police vehicle at the Pulaski State Police substation and observed the black 1951 Buick pass southbound on Route 11, followed immediately by the New York State Police vehicle driven by Trooper Maring.
Trooper Peek, also having received the earlier radio message concerning the theft of the 1951 Buick, took up the chase and followed Trooper Maring and the 1951 Buick south on Route 11. In the ensuing pursuit, on two occasions vehicles from the Oswego County Sheriff’s Department were placed on the highway as roadblocks ahead of the 1951 Buick, but on each occasion, the operator of the stolen vehicle drove around the Sheriff’s car and continued his flight to the south. In the meantime Trooper Maring, on seven or eight occasions, attempted to pass the 1951 Buick in an effort to pull ahead of it and cause it to come to a stop. On these occasions, the operator of the Buick swerved to his left or to his right, thereby preventing Trooper Maring from passing.
At another point in the pursuit, a third New York State Trooper, identified as Trooper McLaughlin, joined in the attempt to halt the stolen Buick; entering Route 11 southbound ahead of the Buick, Trooper McLaughlin thereafter slowed his *39 car and attempted to maintain a position directly in front of the Buick and thus force it to come to a halt; this effort, likewise, was unsuccessful since the operator of the Buick struck the rear of Trooper McLaughlin’s vehicle causing it to go out of control and off to the side of the highway, at which time the Buick continued on ahead of Trooper McLaughlin; the latter’s car shortly thereafter skidded out of control and Trooper McLaughlin no longer continued the chase.
During the course of the pursuit, both Troopers Maring and Peck from time to time attempted to blind the operator of the Buick by focusing the spotlights of their police cars on the stolen vehicle and by directing the highbeams of their headlights on that car, but did not attempt to shoot at the tires of the fleeing vehicle.
There came a time when Trooper Maring’s vehicle began to run low on fuel, and for this reason Troopers Peck and Maring caused their vehicles to exchange places so that from that point on Trooper Peck’s car was immediately behind the stolen vehicle and Trooper Maring’s some distance to the rear of Trooper Peck’s vehicle.
The pursuit covered a distance of from 34 to 38 miles on Route 11 from Pulaski, N. Y. to the point where the accident ultimately occurred, required 35 to 40 minutes time and was conducted at speeds at times up to 90 miles per hour; at other times, when proceeding through populated areas or in meeting other traffic on the highway, the vehicles were operated at lower rates of speed; between Pulaski and Central Square there was a very minimum of traffic; the chase led through the Village of North Syracuse and eventually approached the vicinity of the large traffic interchange south of that village, known as Northern Lights Traffic Circle above mentioned; in this area Trooper Peck stated the amount of traffic on the highway increased.
At this point, three highways, namely Route 11, Interstate Route 81, and the South Bay Road, so-called, meet in a large traffic circle or interchange. Route 11 north of the traffic circle is a two-way highway with no mall or median dividing the north and southbound traffic, and is approximately 45 feet in width, accommodating three lanes of traffic, two southbound and one northbound; at the point where this section of Route 11 meets the traffic island above mentioned, on the approach to the north edge of the traffic circle, the two lanes of southbound traffic are channeled into a roadway about 24 feet in width accommodating two lanes of traffic along the west side of such traffic island and separated by such island from the two-lane roadway provided for northbound traffic along the east side of such traffic island. *40 It was on the part of the roadway reserved for northbound traffic where claimant, Angela I. Jansen, had brought her vehicle to a stop for said traffic light.
About 57 feet to the north of this island, said Bailey Road intersects .said Route 11 from the west and the traffic signal lights located at this intersection control traffic both on Route 11 and on Bailey Road.
As the two State troopers pursuing said stolen vehicle were proceeding southerly along said Route 11, they were in radio communication with each other and they evolved a plan whereby in the widened portion of Route 11 just north of the traffic island, Trooper Peck would attempt to pass the stolen vehicle on the left and Trooper Haring on the right so that with their troop cars they would attempt to “ box in ” or “ wedge in ” the Buick in said one-way southbound section of Route 11 at said traffic island. They also considered forcing the stolen vehicle into the mall dividing the southbound from the northbound roadway; alternatively, the troopers planned that at least one of their two vehicles would proceed ahead of the 1951 Buick and cause it to slow down.
Thus, as the vehicles neared the area where the plan was to be executed, Trooper Peck accelerated his car, which was then about 6 to 10 feet behind the Buick to the left center of the highway, and brought it alongside the left of the Buick until it reached a point where the front of the police car was approximately even with the rear of the front wheels of the Buick. Shortly after this maneuver was commenced, Trooper Haring accelerated his troop car and turned it to the right with the intention of passing it on the right side. Trooper Peek testified he was unable to state the distance his car and the Buick continued in these relative positions.
At a point near the intersection of Bailey Road, the operator of the stolen Buick suddenly turned that vehicle to the left and it came into collision with Trooper Peck’s vehicle, the left side of the 1951 Buick striking the right side of Trooper Peck’s car, damaging its right front fender and its two headlights on the right side. Following this collision, these two automobiles continued southerly substantially side by side and proceeded into the one-way northbound lane of Route 11 where claimant’s automobile was standing and where the collision between the 1951 stolen Buick and the claimant’s 1961 Buick convertible automobile then occurred.
Hrs. Jansen was unable to state definitely whether or not her automobile was also struck by either of the police vehicles, but the court after hearing the testimony and particularly after *41 examining claimant’s photographic Exhibits Nos. 7, 8, 9, 10, 14 and 16 finds that there was no actual contact between the claimant’s automobile and either Trooper Maring’s or Trooper Peck’s vehicle.
As a result of the impact between the claimant’s vehicle and the 1951 Buick, the claimant Angela I. Jansen received injuries which are detailed in the findings which have been marked by the court and filed with this decision.
At the outset, it is noted that there is no evidence which has been adduced in this case indicating that there was any negligence on the part of the claimants herein or either of them, and the court finds that both claimants were free of any negligence which caused or contributed to said accident or to claimant Angela I. Jansen’s injuries.
The court recognizes that negligence on the part of the State cannot be predicated on any acts of the operator of the stolen 1951 Buick in his flight to avoid apprehension. Negligence, if any, must be predicated on the actions of the troopers. (Stanton v. State of New York, 29 A D 2d 612, 613.)
The provisions of section 1104 of the Vehicle and Traffic Law permit the State Police under circumstances outlined therein to operate their vehicles at rates of speed in excess of legally prescribed limits and to disregard regulations governing directions of movement; the court also respects the proposition that the responsibility imposed on the police officers under subdivision (d) of said section “ to drive with due regard for the safety of all persons ” does not “ require compliance with the generally accepted definition of negligence ”. (Stanton v. State of New York, supra.)
It is to be noted, however, that this freedom from the rule requiring “compliance with the generally accepted definition of negligence ” applies to the permissible manner of operation of emergency vehicles as authorized by said section, but not as to the conduct or actions of police officers in the general discharge of their duties; as to such conduct, the “ generally accepted definition of negligence ” applies.
The principal issues to be resolved on the question of negligence are, first, whether there was any negligence on the part of the State under the facts and circumstances of this accident, and, second, if such negligence exists, whether it was a proximate cause of this accident and of the injury and damages sustained by the claimants.
In determining the proximate cause, duty and foreseeability are the guidelines to be considered. (Williams v. State of New York, 308 N. Y. 548; Stanton v. State of New York, supra.)
*42 The law applicable to the present case is distinguishable from the principles laid down in Wrubel v. State of New York (11 Misc 2d 878) and Stanton v. State of New York (supra); in both the latter cases wherein the State was held not to be liable for negligence, the police officer was merely pursuing the miscreant when the latter collided with the claimant; in neither of those cases did the collision between the fleeing vehicle result from any particular planned mode of operation adopted by the pursuing officer and in both those cases the collision with the claimant’s vehicle clearly was caused directly as a result of the individual negligence of the operator of the pursued vehicle.
In the Wrubel case (supra) which was a decision by now Presiding Judge Feed A. Young of this court and which was recently cited with approval by the Appellate Division in Stanton (supra), Judge Young, in holding that the State was not liable under the facts in that case stated, “In so holding we do not say that it is impossible for an officer to be negligent or reckless in the performance of his duties ”. . (Wrubel v. State of New York, supra, p. 880.)
This court finds and concludes that in the present case, the collision between the fleeing car and claimant’s automobile occurred at least in part as a result of a plan of action deliberately formulated by the two police officers after conferring over their car radios; they were familiar with the traffic pattern at the point where they expected to effectuate their plan; they were chargeable with knowledge that their intention, as they testified on this trial, to “ wedge in ” or to “ box in ” the fleeing vehicle at the point they agreed upon, would be likely to result in injury to persons or property legally in or near that busy location. They were aware that to put their plan into operation, in an area where the prescribed speed was 35 or 40 miles per hour, they would be required to increase their speed which was already approximately 50 miles per hour, to place their vehicles ahead of the miscreant, and the proof showed that Trooper Peck’s speed in attempting to pass the vehicle was then in excess of 50 miles per hour. The proof showed also that the pavement was wet and slushy to such an extent that the pavement markings were not visible.
Their experience with this fleeing operator of the black Buick was such that they were on notice that he was likely to take drastic steps to avoid apprehension. Each time a trooper’s car had attempted to pass the fugitive — and this occurred on eight or ten occasions during the chase of over 30 miles — he had swerved from side to side and had successfully prevented the police car from passing him. The plan evolved by officers *43 Peck and Haring included and required the operation of their vehicles on either side of the Buick at a very busy intersection; since the fugitive, on one occasion during the chase, had intentionally collided with Trooper McLaughlin’s car and forced it off the highway, it was only reasonable for Peck and Haring to anticipate that the fugitive would, as he eventually did, employ similar tactics when he found a police car on each side of him.
The restraint evidenced by the troopers during the long chase was commendable insofar as the fugitive was concerned, but their care was misplaced; his brazen flouting of their authority in their attempt to perform their duty in effectuating his arrest, should have prompted them to apply more direct force to stop him while still in the relatively traffic-free areas through which the pursuit had extended. The proof showed that no shot was fired at the tires of the fleeing vehicle although the police cars were at times following the stolen car so closely that such action should have been indicated. Also, no attempt was made by the State Police to erect a stationary road block although near the end of the pursuit, these vehicles traveled past the State Police barracks at North Syracuse, about one-half mile north of where this accident eventually occurred.
While it may be said that extreme measures such as shooting the fugitive’s tires were not indicated, since the only charge to be placed against the fugitive was for the theft of a 13-year-old automobile, nevertheless, it is also true that no greater urgency existed at the point of the accident to justify the somewhat bizzarre method devised for his apprehension, than had existed during the lengthy chase.
Also, while it is recognized that occurrences such as involved here should not be evaluated in retrospect, this incident did not evolve from an emergency in which time was extremely limited, but from a plan that ripened after the police had sufficient opportunity for reflection in considering their proposed method of procedure and its possible results.
It seems that their alternative expectation that by driving their troop cars on each side of the fugitive, they could thereby force him into the mall between the southbound and northbound divided sections of the highway, was also fraught with potential danger for persons whom they might reasonably expect to be in that immediate vicinity; it would appear that under such a plan, the troop car proceeding southerly on the left of the fugitive, would be required to enter the northbound section, the location of the Jansen vehicle.
*44 The evidence clearly established that an uninterrupted view of the area where the Jansen automobile was standing, was available to the police officers throughout the last approximately 500 feet traversed by them before arriving at the point of the collision; thus they were ‘ ‘ bound to see what by the proper use of [their] senses [they] might have seen (Weigand v. United Traction Co., 221 N. Y. 39, 42.) Nevertheless, Trooper Peck, whose troop car was on the fugitive’s left side, stated he was looking south while traveling said distance of 500 feel but he did not see claimant’s car until the stolen Buiek collided with his vehicle and that at this time he was only about 40 or 50 feet from the Jansen car, and that at this time he applied his brakes for the first time; also Trooper Haring testified that he did not observe the claimant’s vehicle until just after this same collision between Peck’s vehicle and the stolen Buick.
When the presence of the Jansen automobile became known to the police officers, or in the exercise of reasonable care should have become known to them, they should have interrupted and abandoned their plan to ‘ ‘ box in ’ ’ the fugitive at approximately the very point where the Jansen car was standing, allowed the fugitive to enter the one-way southbound roadway west of the mall, and made plans to apprehend him in some other manner. Surely, the “ risk reasonably to be perceived ” at that time, defined ‘1 the duty to be obeyed ’ ’.
It is the finding and conclusion of this court, upon all the facts and circumstances of this accident, that the State of New York through its said agents and employees was guilty of negligence that was a concurring proximate cause of said accident and the resulting injuries and damages sustained by claimants that were attributable thereto.
However, the court finds that the only period of total disability sustained by claimant Angela I. Jansen attributable to the injuries received by her in this accident, was from February 14, 1964 to February 21, 1964 inclusive; on February 21, 1964 she was admitted to a hospital in Toronto, Canada for the performance of an operation involving a lumbo-sacral disc condition which antedated said accident and was unrelated thereto. She was disabled due to such operation until her discharge on Hay 1,1964. She has sustained, due to this accident, some partial disability since that date by reason of some pain and discomfort, as more particularly set forth in the findings forming a part of this decision.
Likewise, her disability occasioned by said disc operation required the services of a housekeeper employed by claimant Q-unter Jansen during her weeks of recuperation and such *45 required services were not due to this accident and no part of the award made to him herein, represents any amount paid by him for housekeeping services during said period.
Claimant Angela I. Jansen is entitled to an award against the State of New York in the amount of $7,500 for all damages including all pain and suffering sustained and to be sustained by her as a result of said accident.
Claimant Gunter Jansen is entitled to an award against the State of New York in the amount of $1,000 for all damages sustained by him including loss of services and companionship of his said wife and for all medical treatment and hospital care incurred by him, or which he has become liable to pay, for her care and treatment.
All motions on which decision was reserved on the trial herein are now denied.