OPINION OF THE COURT
Henry W. Lengyel, J.
This is a claim for monetary damages for the wrongful death on June 17, 1972, and conscious pain and suffering of the deceased, Debra Jane Januszko; and for the loss of Debra’s services and companionship and the emotional distress, pain, suffering and discomfort of the parents of the deceased. The claim was duly filed and served.
On September 5, 1971, Joseph Baldi was arrested in Queens County and was charged in the New York City Criminal Court for Queens County under Docket Nos. Q18705 and Q18706, with the attempted murder of a police officer, unlawful possession of a loaded revolver, burglary, and criminal possession of stolen property. Bail was set in the sum of $30,000 and Legal Aid Society counsel was assigned to Mr. Baldi. The Criminal Court ordered Baldi transferred to Kings County Hospital for mental observation.
On September 17 and 21, 1971, Baldi was examined at Kings County Hospital by two qualified psychiatrists who determined that he lacked the capacity to understand the proceedings against him or to assist in his defense. The two examining psychiatrists did not find Baldi to be a dangerous incapacitated person. Their examination report indicated that they were appointed examining psychiatrists by Dr. Seymour Gers, Director of Kings County Hospital Center, pursuant to an order for examination signed by the Hon. Lawrence T. Gresser of the Criminal Court, Queens County.
On October 7, 1971, a notification of consideration of hospital findings by the Supreme Court, Kings County, at a Criminal Term to be held on October 14, 1971, was mailed, inter alia, to Hon. Thomas Mackell, District Attorney of Queens County, and to Robert Kasanoff, the Legal Aid Society assigned counsel.
On October 14, 1971, by order of Supreme Court Justice Beatrice M. Judge, Mr. Baldi was committed to the care and custody of the Commissioner of Mental Hygiene of the State *1043 of New York for care and treatment in an appropriate institution of the Department of Mental Hygiene, for a period not to exceed 90 days from October 14. The court’s order also provided that, if the person in charge of the institution to which Baldi was confined determined that he was no longer an incapacitated person, notice in writing of such fact "shall” be given by the person in charge of the institution to "this court and to the District Attorney”. Other than the words and numbers "Docket No. Q18705/06”, there was no mention of Queens County in Justice Judge’s "Temporary Order of Observation”.
Baldi was delivered to Mid-Hudson Psychiatric Center by officers of the New York City Department of Correction on October 19, 1971. The officers also delivered the three sets of papers referred to above.
Mid-Hudson Psychiatric Center consisted of one of the buildings at Matteawan State Hospital. It was being used as an "independent short-term maximum security hospital”. According to Department of Mental Hygiene, Memorandum No. 71-40, dated August 9, 1971, in reference to CPL article 730 which became effective September 1, 1971, the department intended that Mid-Hudson: "will be used as a reception, diagnostic, intensive treatment and referral center. On arrival, defendants will be assessed as to their suitability for management in a civil state hospital. Section 85 proceedings will be instituted for those judged not so suitable. Of the others, some will receive intensive treatment with a view toward rapid return to court to stand trial, the remainder will be referred to the civil state hospital serving the person’s catchment area.”
On October 19, 1971 a letter was written by the supervising attorney of the Mental Health Information Service, State of New York, Second Judical Department, to Queens County District Attorney Mackell, attention of James D. Robertson, Esq., Deputy Chief Assistant District Attorney, advising that Baldi had been committed to Mid-Hudson. On October 27, 1971, Mr. Robertson wrote a memorandum to Norman D. Archer, Chief, Grand Jury Bureau. Mr. Archer was advised that Baldi had been committed to Mid-Hudson. Archer was requested to present the felony complaints against Baldi to the Grand Jury; and, after an indictment was obtained Archer was directed to so advise the Department of Mental Hygiene. Thus there was no question but that the office of Queens *1044 County District Attorney knew of Baldi’s Mid-Hudson commitment.
The face sheet of the Mid-Hudson Psychiatric Center hospital record indicated the commitment order of Justice Judge and further stated: "Crime Attempted Murder A Felony County where Chg. Kings Court Supreme”. There was no specific reference to Queens County on the face sheet except for the word and numbers "Docket No. Q18705/06” which were typed on the line denominated "Correspond with”.
However, the clinical summary which was prepared on November 17, 1971, indicated that some person at Mid-Hudson knew that Baldi was a Queens County problem. It stated in the summary that "the patient was admitted October 19, 1971 from the Criminal Court, County of Queens, under Section 730.40 (Temporary Order of Observation), Docket Number A 18705-06. He is charged with 'Attempted Murder’ (Felony).” There also was, of course, the reference in the examination report of the two examining psychiatrists at Kings County Hospital that they were appointed pursuant to an order of the "Criminal Court, Queens County”.
However, on October 20, 1971, the acting physician in charge of Mid-Hudson wrote a letter to the Kings County District Attorney Eugene Gold requesting background information on Mr. Baldi. As he was not a charged felon in Kings County, Mr. Gold’s office did not have any background information. There was no indication in any of the records received in evidence that Mr. Gold’s office ever replied to that letter.
On November 23, 1971, the Department of Mental Hygiene of New York State issued an order transferring Mr. Baldi to Creedmoor State Hospital. Claimants’ counsel contended that such a transfer without notice to the Queens County District Attorney violated CPL article 730; and, also caused Queens County to lose track of Baldi. I found no such statutory notice requirement and I consider this argument without merit. The order required the director of Creedmoor to receive the patient upon presentation of the original order, together with the original admission paper and the case record. On November 30, 1971, Baldi was admitted to Creedmoor together with his records from Mid-Hudson.
Baldi’s treating psychiatrist at Creedmoor was Dr. Ferdinand Gociar, a staff psychiatrist and medical administrator in the Jamaica Unit of Creedmoor. Dr. Gociar was not certain *1045 that he had received the entire Mid-Hudson record. However, he did recollect receiving a "Temporary Order of Observation” and a clinical summary; and, he said he always read the papers sent with a new patient. Apparently he did not read the clincial summary with any degree of care. Because the "Temporary Order of Observation” referred to the Kings County Supreme Court, he assumed that Baldi was charged with the crime of attempted murder in Kings County.
In the middle of December, 1971, Dr. Gociar formed the psychiatric opinion that Baldi was not incapacitated. His opinion on Baldi’s condition was apparently so strong that he permitted Baldi to leave the hospital and go home to be with his mother over Christmas and New Year’s and also on January 8, 1972. Baldi returned to the hospital after each leave period without causing any problems.
At about the same time that Dr. Gociar decided that Baldi was not incapacitated and permitted him to spend the holidays with his mother, the Queens County wheels of criminal justice were moving towards an indictment of Mr. Baldi. On December 23, 1971, the Grand Jury handed down indictments for "Attempted Murder”, "Reckless Endangerment 1st Deg.”, "Burglary 2nd Deg.”, "Possession of Weapons and Dangerous Instruments and Appliances — Felony”, "Criminal Possession of Stolen Property 3rd Deg.”, and "Petit Larceny”. Having obtained the indictments, the aforesaid wheels of justice stopped. Nothing further was done relative to the indictments until after the murder of Debra Jane Januszko on June 17, 1972. As the indictments were not sent to Mid-Hudson or any other State agency, the State did not have knowledge of the indictments. (See CPL 730.40, subd 5.)
On January 11, 1972, Dr. Gociar changed Baldi’s patient status from "Temporary Order of Observation” to "Voluntary Status”. On January 12, Dr. Gociar wrote a letter to Eugene Gold, Esq., 400 Municipal Bldg., Brooklyn, N. Y. He advised the Kings County District Attorney that a "Certificate of Custody” was enclosed for Joseph Baldi, and that a copy of the certificate was also being sent to "Lower Court 120 Schermerhorn Street, Brooklyn, N. Y.”. A similar letter enclosing a certificate of custody was mailed to the "Lower Court” at the Schermerhorn Street address. This letter advised the reader of the letter, if it was ever read, that a letter had been written to District Attorney Gold. Both letters indicated they were in reference to Joseph Baldi, Docket No. Q18705/06. Neither the *1046 Kings County District Attorney’s office nor the "Lower Court” ever responded to Dr. Gociar’s letters.
Dr. Gociar stated he waited more than 10 days past the 90-day retention; and, after speaking to some person in the Mental Health Information Service, he came to the conclusion that Baldi had to be discharged.
Mr. Baldi was discharged on January 21, 1972. He was directed to attend the Queens Hospital area aftercare clinic. There was no proof that he ever did so.
Debra Jane Januszko was born February 12, 1957. On June 16, 1972, she was a vibrant, intelligent and happy young lady slightly over 15 years of age. She came home that night about 9:00 p.m. and asked her mother for permission to paint her bedroom the next day. Permission was granted and Debra emptied her room of her possessions except for a bed. The family, Debra and her parents, went to bed between 11:00 and 11:30 p.m.
At about 3:30 a.m., June 17, 1972, the parents were awakened by screams from Debra’s room. They got up and rushed to her side. She was sitting on her bed and when asked what was the trouble, she said "I have been stabbed”. When asked how, she answered "Through the window”. Initially there was no blood and then the blood started to gush from Debra. Her parents had problems obtaining help but finally local precinct police officers appeared and transported Debra to the hospital where she was found to be dead on arrival. The autopsy revealed a 5-inch deep stab wound in the right side of the chest.
Subsequently, Joseph Baldi was arrested for Debra’s murder. He was indicted, tried and on December 19, 1974, he was "found guilty of Murder by verdict of jury”.
Baldi was also tried and convicted on October 24, 1974, under three of the indictments which had been handed down on December 23, 1971. Three of the six counts under that indictment were withdrawn prior to trial. He was convicted of attempted murder, possession of weapons as a felony, and burglary in the second degree.
Claimants’ counsel do not rely upon negligence predicated upon lack of medical judgment. In fact, in their posttrial reply memorandum it was written: "We do strenuously contend that this case is not one involving medical 'judgment’: it is one involving a blatant, and now, by silence, conceded breach and *1047 violation of the statute, rules, regulations, and official forms promulgated pursuant thereto of the State of New York.”
There is no question but that the factual situation developed, between the October 14, 1971, temporary order of observation of Justice Judge and the release of Baldi unfettered onto the streets of Queens County on January 21, 1972, was redolent with carelessness and bureaucratic ineptness and/or indifference.
The statutes with which we are concerned are contained in CPL article 730.
CPL 730.40 (subd 2), in effect in January, 1972, provided, in pertinent part, that: "When the defendant is in the custody of the commissioner at the expiration of the period prescribed in a temporary order of observation, the proceedings in the local criminal court that issued such order shall terminate for all purposes and the commissioner must promptly certify to such court and to the appropriate district attorney that the defendant was in his custody on such expiration date. Upon receipt of such certification, the court must dismiss the felony complaint filed against the defendant.” It should be noted that, as utilized in the CPL, the term local criminal court includes, inter alia, the New York City Criminal Court; and the term superior court includes the Supreme Court or a County Court. (CPL 10.10.)
In my opinion, the initial confusion in this whole rather bizarre series of events was initiated by the confusing terminology set forth in CPL 730.30 relative to the order of examination to determine the criminal defendant’s fitness to proceed on criminal trial. The first two subdivisions of the section and the first three lines of subdivision 3 refer to action by the local criminal court. Then the language shifts and refers to the superior court. I note the statute was amended in 1974 to delete reference to the superior court in subdivision 3. In any event, under a clear reading of the 1971 statute, the examination reports in the case at bar should have been submitted to the local criminal court which had ordered the examination, i.e., the Criminal Court of the City of New York, Part 1A, County of Queens; and then, pursuant to the clear requirements of CPL 730.40, the local criminal court should have issued the temporary order of observation under the facts at bar. If the clear intention of the statutes had been followed, I do not believe the confusing mix-up would have occurred *1048 relative to which District Attorney’s office and which local criminal court was to be notified.
Unfortunately, either because of the confused terminology in CPL 730.30 (subd 3), or because of some administrative judicial problem in New York City which was not drawn to my attention at trial, the examination report of the two psychiatrists was referred to a Criminal Term, Part XI of the Supreme Court, Kings County. The temporary order of observation was issued by Justice Judge. The papers which accompanied the criminal defendant Baldi to Mid-Hudson contained much more explicit reference to Kings County than they did to Queens County; and, the control of the proceedings was removed from the local criminal court, which had contact in depth with defendant Baldi, to the superior court, which had but casual contact with the Baldi felony complaint.
It is, of course, very probable that the above erroneous procedure was followed because this was a new criminal procedure statute and all of its administrative "bugs” had not yet surfaced and/or were not yet straightened out.
It should be noted that the Department of Mental Hygiene Memorandum No. 71-40, mentioned above, continually referred to "lower court” when speaking of felony complaints and to "superior court” when speaking of felony indictments. This, I assume, is why Dr. Gociar sent the certificate of custody to the "Lower Court” at 120 Schermerhorn Street, Brooklyn, N.Y.
There is no question, of course, but that Dr. Gociar did not comply with the specific direction in Justice Judge’s order that "if the person in charge of the institution in which the defendant is confined determines at any time that the defendant is no longer an incapacitated person, such person shall give notice in writing of such determination to this court and to the District Attorney”. Dr. Gociar made such a determination in mid-December, 1971 but no notice of that fact was given to the Criminal Term, Part XI of the Supreme Court, Kings County, or any other court.
The final administrative error brought to my attention in the claim at bar was that the Supreme Court, in which the original indictments against Baldi were filed, apparently did not comply with CPL 730.40 (subd 5) which required: "When an indictment is timely filed against the defendant after the issuance of a temporary order of observation or after the expiration of the period prescribed in such order, the superior *1049 court in which such indictment is filed must direct the sheriff to take custody of the defendant at the institution in which he is confined and bring him before the court for arraignment upon the indictment. After the defendant is arraigned upon the indictment, such temporary order of observation or any order issued pursuant to the mental hygiene law after the expiration of the period prescribed in the temporary order of observation shall be deemed nullified.” I used the word "apparently” above because Dr. Gociar had no knowledge of the indictments and there was no reference in the hospital records to such indictments. Claimants’ counsel proved that the office of the Queens County District Attorney did not file such indictments with the State hospital. However, I found no requirement in CPL article 730 that the District Attorney had to perform that function.
While the failure of the superior court compounded the complexities of the problem and contributed in part to Baldi’s improper release, its misfeasance cannot cast liability onto the State of New York in the case at bar.
I find that the State of New York through its employee, Dr. Gociar, was negligent because it did not advise the superior court when Baldi was no longer incapacitated; and, that it was also negligent when the certificate of custody was mailed to the wrong District Attorney and the wrong court. Although the confused statutory picture alluded to above provided a reason for this error, it does not provide an excuse.
Claimants’ counsel contended that the violation of the statutory requirements was negligence per se and came within the doctrine set forth in Daggett v Keshner (6 AD2d 503, affd without opn 7 NY2d 981). I disagree and do not so find.
In my opinion, the law relative to proximate cause as set forth by Judge Froessel in Williams v State of New York (308 NY 548, 549) controls my determination in the case at bar.
I do not believe that the State of New York may be cast in damages for the death of Debra Jane Januszko; and, I so find.
In my opinion, despite the felony complaint with its charges of attempted murder, etc., when one considers the fact that the two committing psychiatrists did not find Baldi dangerous; when the superior court, after hearing, did not find him dangerous; and, when the treating psychiatrist did not consider him dangerous, it was not foreseeable on January 21, 1972, that Baldi would murder Debra Jane Januszko or anyone else on June 17, 1972, or any other date.
*1050 I have arrived at my conclusion with a heavy heart which cries out to the tragedy and sorrow so cruelly visited upon this mother and father. However, as has been so often written, our decisions must be based upon our interpretation of the facts and the applicable law, and not upon sympathy.
I reserved decision upon several of the State’s trial motions. This decision renders a ruling on those trial motions unnecessary.
I dismissed at the conclusion of the trial, that portion of the claim which related to the father, John Jacob Januszko, as he had died prior to the trial.
I reserved decision on the State’s motion to dismiss the claims of Angeline G. Januszko, as administratrix and individually. I now dismiss her claims.
Claim No. 57431 is dismissed in its entirety and the clerk of this court is directed to enter judgment in accordance with my decision.