OPINION OF THE COURT
Thomas J. Lowery, Jr., J.
At about 10:00 a.m. on April 11, 1980, Albert Ast, an employee of the New York State Thruway Authority, was injured when an errant motorist crashed through a wooden barrier that was blocking the lane adjacent to his tollbooth. At the time, the State Police were in pursuit and had requested that he assist them in their effort to box in the miscreant at the exit. It is claimed that the accident and the injuries sustained were the result of the State’s negligence.
The State Police were first made aware of the errant motorist 15 minutes before the accident when they received word that he was heading east on the Thruway at a speed in excess of 100 miles per hour. Shortly thereafter, two troopers assigned to a radar patrol stopped the motorist after he had been clocked traveling at a speed of 112 *201 miles per hour. The motorist, who was later identified as Halbert Brooks, was asked to produce his license and registration. After he did so, the troopers returned to their patrol car for the purpose of authenticating the documents. While the check was being made, one of the troopers directed Brooks to move his vehicle next to the patrol car. He complied. He was then asked to leave his vehicle, bring his keys, and sit in the front seat of the patrol car.
The license produced by Brooks was issued to a person in the name of “Wright”, which did not match the name on the registration. Brooks was then asked to state his date of birth. When he refused, the troopers ordered him out of the car. Brooks was then directed to empty his pockets and he complied to the extent of placing his keys on the hood of the police car. Before the troopers could take possession of the keys, Brooks punched one of the officers and fled. He was cornered seconds later, and began yelling obscenities and daring the troopers to shoot him.
At this point, the exact whereabouts of Brooks’ keys were not known to the troopers and they made no effort either to locate the keys or to secure his car. Instead, one of the troopers returned to the patrol car and radioed for assistance, while the other attempted to apprehend Brooks. Unfortunately, the effort proved futile. Brooks was able to elude the trooper and return to his vehicle. A struggle ensued and Brooks, who had somehow managed to retrieve his keys, started his vehicle and began to drive away. The troopers, concerned with being crushed between the two vehicles, abandoned their efforts to subdue him. Brooks sped from the scene with the troopers in vehicular pursuit.
Thereafter, the troopers observed Brooks approaching exit 39, the interchange where Albert Ast was employed. The troopers then issued a “Signal 30” on the radio, which, indicated that tl>ey were in need of assistance. They also, as was their practice at times, radioed the tollbooth and requested that the collectors block the lanes. Ast complied by leaving his booth and lowering a 2 x 8 wooden barrier across the lane. Upon returning to his booth, he observed that the barrier was not fully secured. He left his booth a second time and refastened the barrier. On his way back, *202 he observed the Brooks’ vehicle heading towards an adjoining lane that was blocked by a patron’s car. Instead of returning to his booth, Ast attempted to warn the patron of the impending danger. At the last second, however, Brooks altered his course and entered Ast’s lane, crashing through the wooden barrier. The barrier shattered and flying splinters struck Ast in the face.
The claimants first contend that the accident and resultant injuries were caused by the negligence of the State troopers in failing to exercise due care to prevent Brooks from proceeding further once he had been stopped.
In essence, what is being alleged is a failure to provide effective police protection, a governmental function. In such cases, liability depends upon the existence of a special duty owed by the State to the injured party to exercise due care. (De Long v County of Erie, 60 NY2d 296; Vitale v City of New York, 60 NY2d 861; Garrett v Holiday Inns, 58 NY2d 253; Riss v City of New York, 22 NY2d 579; Dutton v City of Olean, 60 AD2d 335, affd 47 NY2d 756; Bass v City of New York, 38 AD2d 407.) This duty may be created where the status of the claimant gives rise to a special relationship. Thus, a special duty is owed to informers (Schuster v City of New York, 5 NY2d 75); undercover agents (Swanner v United States, 309 F Supp 1183); persons under court orders of protection (Baker v City of New York, 25 AD2d 770). Another way the duty may be.created is where a special relationship arises from affirmative statements or acts which induce reliance to the claimant’s detriment (Moch Co. v Rensselaer Water Co., 247 NY 160; Prosser, Torts [4th ed], § 56, p 340), for example where a duty has been undertaken to provide emergency police services (De Long v County of Erie, supra); where a building has been certified as safe to its owners (Garrett v Holiday Inns, supra); where crossing guards have been provided to school children (Florence v Goldberg, 44 NY2d 189); and where police protection has been furnished and later withdrawn. (Zibbon v Town of Cheektowaga, 51 AD2d 448, app dsmd 39 NY2d 1056.) It may also arise where affirmative police action is so integrally related to the sequence of events leading to the claimant’s injury that it may be said that the action itself created the danger. *203 (Lubelfeld v City of New York, 4 NY2d 455; Adamo v P. G. Motor Frgt., 4 AD2d 758; Nelson v City of New York, 100 Misc 2d 309, affd 75 AD2d 1025; Jones v County of Herkimer, 51 Misc 2d 130.) In the absence of some affirmative action, however, a special duty is not created merely because an individual is likely to be endangered by known criminal activity. (Riss v City of New York, supra; Dutton v City of Olean, supra; King v City of New York, 3 Misc 2d 241.)
Applying these principles to the present case, it is readily apparent that at the time Brooks was stopped and detained, Ast enjoyed no special relationship with the troopers that would give rise to a special duty. At that point, he had no contact with the troopers and his status was merely that of a member of the general public, to whom no particular duty was owed. Moreover, having had no contact with the troopers, he had no knowledge of their actions so that it cannot be said that he relied thereon to his detriment. Finally, the troopers’ actions did not create the danger, since they were reasonable under the circumstances.[1] The danger was created by Brooks’ unanticipated flight from detention, an act that cannot be attributed to the troopers. Thus, it cannot be said that the troopers launched the force that caused the injury to Ast.
Next, it is claimed that a special relationship may be gleaned from the long-standing practice whereby toll collectors would provide law enforcement assistance when requested. It is argued that this relationship imposed a duty on the troopers to exercise due care in making such requests and, further, that said duty was breached.
In this regard, it is noted that public policy favors the existence of such a duty. Statutes have been enacted that encourage citizens to give assistance to police officers (Penal Law, § 195.10) and also require municipalities to respond in damages to persons who have been injured or killed as a result of aiding in law enforcement. (General Municipal Law, § 71-a.) Unfortunately, the General Municipal Law has no application to the State (see General *204 Municipal Law, § 2), and there is no corresponding statute applicable to the State. This is an apparent oversight, since the intent of the Legislature is clear, as demonstrated by section 79-f of the Civil Rights Law, which provides for the State to compensate persons injured by the acts of those who have come to the aid of police officers.
Aside from the special relationship that was born out of this practice, it may be said that a duty to exercise due care arose out of the troopers’ very act of requesting assistance, since it set in motion a chain of events that led to Ast’s injury.[2] In such a case, the duty would be owed not only to those who may have responded to a request for assistance, but also to those individuals who may have been within the ambit of the foreseeable risk. (See Lubelfeld v City of New York, 4 NY2d 455, supra; Selkowitz v County of Nassau, 58 AD2d 888, affd 45 NY2d 97; Adamo v P. G. Motor Frgt., 4 AD2d 758, supra; Nelson v City of New York, 100 Misc 2d 309, affd 75 AD2d 1025, supra; Jansen v State of New York, 60 Misc 2d 36, affd 32 AD2d 889; Jones v County of Herkimer, 51 Misc 2d 130, supra.)
The question that remains is whether, under the circumstances, the duty was breached. This question must be answered in the affirmative. In this regard, if the troopers exercised due care in determining whether a request for assistance should be made and such determination was their best judgment under the circumstances, no liability will attach, even though hindsight might disclose that the determination was wrong (cf. Stanton v State of New York, 29 AD2d 612, affd 26 NY2d 990). It hardly can be said, however, that the requisite care was exercised and that they used their best judgment, particularly in light of *205 accepted police practice and their own manual which mandated that the safety of the public take precedence at all times. Their knowledge of Brooks’ conduct following his flight from detention, i.e., assaultive and erratic behavior and refusal to obey commands, would have prompted a reasonable police officer to refrain from making such a request, for it was foreseeable that Brooks would ignore the barrier and that injury would result.
Hence, the court finds that the troopers were negligent, and that such negligence was a concurrent proximate cause of the accident and resultant injuries (see Koester v State of New York, 90 AD2d 357, app withdrawn 58 NY2d 972), for which the State will be held liable. (Court of Claims Act, § 8; McCrossen v State of New York, 277 App Div 1160.)
Although it was also contended that the State was negligent in failing to establish written procedures that specifically govern the use of toll collectors in assisting police, no liability can be premised on such a ground. (Southworth v State of New York, 62 AD2d 731, affd 47 NY2d 874.)
Two affirmative defenses set forth in the defendant’s amended answer need be addressed at this time. First, it was asserted that the claimant’s sole and exclusive remedy was workers’ compensation, suggesting that at the time he was injured he was a special employee of the State. Such-presents a question of fact which, after considering the factors[3] that determine such a relationship, must be resolved here in favor of the claimants. (See Bird v New York State Thruway Auth., 8 AD2d 495; Dempsey v New York State Thruway Auth., Ct of Claims, June 6, 1983, Koreman, J., affd 99 AD2d 576.) Second, a question is raised with respect to the culpable conduct of Ast. (See CPLR 1411, 1412.) It is urged that his failure to return to his tollbooth immediately after refastening the wooden barrier constituted negligence which contributed to the accident and his resultant injuries. The court disagrees. His conduct is to be judged in light of the existing circumstances. (Ferrer v Harris, 55 NY2d 285.) At the time, he was responding to an emergency that was brought about by the *206 presence of a patron’s vehicle in the adjacent lane.[4] Hence, his conduct is found to have been reasonable.
Turning to the injuries sustained by Albert Ast, the most serious was a ruptured left eye. This necessitated its removal and subsequent replacement with a silicone implant. He also sustained lacerations over the entire left side of his face and compound comminuted fractures of various facial bones, including the left zygomatic bone, left maxillary antrum, left palate, and left mandible. These injuries caused extensive bleeding, necessitating blood transfusions and a ligation of the left external carotid artery. The trauma was accompanied by considerable swelling of the face, head pain, dizziness and discomfort. He also experienced difficulty in breathing which required the insertion of an endotracheal tube. In addition, the trauma resulted in a broken denture.
He was hospitalized for 10 days following the accident. After his discharge, nurses were required to come to his home to clean his wounds and to drain the eye socket so as to prevent infection. He continued to suffer from persistent headaches and dizziness to the extent where a neurosurgeon was consulted. In May of 1981, he underwent surgery to graft cartilage from his rib cage onto the area of his left cheek. Additional surgery was required in October of 1981 to correct a previously asymptomatic deviated septum that had become aggravated by swelling from his facial injuries.
Mr. Ast’s injuries are of a permanent nature. His facial injuries have been a constant source of pain. The fractures in the left facial area have resulted in an unsightly distortion. The lacerations to his face have resulted in scarring. The loss of his left eye has resulted in constant drainage, diminished his visual field, impaired his depth perception and enhanced the risk of total blindness. The trauma to his nose has resulted in extensive scarring, swelling, and considerable inflammation of the nasal passages. As a result, he has difficulty breathing. His sense of smell has been significantly diminished and those odors that he can *207 discern seem objectionable. He also has surgical scars in the area of the chest.
Mr. Ast was 67 years of age[5] at the time of the accident and had previously enjoyed good health. Following the accident, he was totally disabled and was unable to work until mid-October of 1980. His lost wages for this period of time total $7,336.70. After he returned to work, the exposure to cold weather necessitated by his job affected him adversely, and caused impaired breathing and a nasal drip. Hence, he asked for early retirement effective March 1, 1981. He had intended to continue working until he reached the mandatory retirement age of 70 in April of 1983. Had he continued to work through this date, he would have earned an additional $35,897.39. He would also have been eligible for $5,850.38 additional retirement benefits had he not retired early. Medical specials total $15,816.73.[6]
At the time of the accident, he was a leader in the community. He was active in boy scouting; he was a volunteer fireman, a member of the Planning Board of the Town of Van Burén, and formerly a member of the town board; he was a 4-H leader; and he was an active lay preacher. In short, he was an outstanding citizen. As a result of the accident and the injuries sustained, he has been forced to severely restrict his activities. He can no longer perform maintenance tasks about the home that require the use of both eyes. He no longer reads for pleasure. His facial distortion is a source of embarrassment and humiliation. Hence, he no longer participates as a preacher on a regular basis and his social life, as well as that of his wife, has been substantially curtailed. The injuries have had a devastating effect upon his personality. In the words of one witness, he has aged over 20 years. He is no longer the man who arrived at work early to raise the flag and who would shovel snow and dance on the abutments.
As a result of the accident and the injuries sustained, Albert Ast has been damaged in the sum of $300,000.
*208 Estelle Ast, wife of Albert, seeks to recover damages for loss of consortium. Such a claim embraces not only services and support, but also such elements as love, companionship, affection, society, and sexual relations. (Millington v Southeastern Elevator Co., 22 NY2d 498.)
She had been married to Albert for 39 years when the accident occurred. As a result of the injuries sustained by her husband, she was required to undertake certain household tasks that he had previously performed. They did not sleep in the same bed for four months following the accident. In addition, she has lost his companionship in society. In sum, the quality of her life has somewhat been diminished.
As a result of the accident and injuries to her husband, Estelle Ast has been damaged in the sum of $10,000.
Accordingly, the claimant Albert Ast is awarded the sum of $300,000 for all damages sustained as a result of the accident and Estelle Ast is awarded the sum of $10,000 for all damages sustained by her as a result of the accident.
The foregoing constitutes the decision of this court pursuant to CPLR 4213.[7]

. Section 223 of the Executive Law imposes a general duty upon the State Police to prevent and detect crime, apprehend criminals, make arrests, etc. Brooks was stopped for being a traffic violator. Up to the point when he fled detention, he had been generally cooperative.

. Any attempt by the State to avoid liability on the ground that the decision to request assistance was a discretionary governmental act and, hence, was immune from review, must be rejected. The doctrine of limited immunity for such acts espoused by Weiss v Fote (7 NY2d 579) has no application here. The decision to request the assistance of toll collectors did not reflect a State policy mandating the use of toll collectors under all circumstances, but rather arose out of the troopers’ day-to-day responsibilities, for the negligent performance of which they may be held liable. Parenthetically, even if there had been such a policy, the proof amply supports a finding that it would have been inherently unreasonable and, thus, it would have fallen within one of the exceptions to the Weiss rule. (See Schuls v State of New York, 92 AD2d 721.)
It is further noted that no claim is made that the troopers were negligent in the operation of the troop car. Therefore, the qualified immunity afforded by section 1104 of the Vehicle and Traffic Law need not be addressed.

. That is, who paid Ast’s wages; who had the right to hire and fire Ast; the type of business in which he was engaged; and who had control over him at the time.

. The State contends that Ast’s action in not returning to the tollbooth constituted an intervening, superceding cause. This is rejected, since such action was a foreseeable consequence of the State’s negligence. (See Derdiarian v Felix Contr. Corp., 51 NY2d 308.)

. At the time of trial, he was 70 years of age and had a life expectancy of 11.3 years and a work expectancy of 5.4 years. (See 1 NY PJI 269, 274 [1983 Supp].)

. Dr. Mesick $335; Dr. Stark $3,112.96; Dr. Gillis $653.92; Dr. Modesti $91.23; Dr. Brewer $93.85; Dr. Sears $52.47; Upstate Medical Center $8,974.22; Onondaga County Health Department $777; Crouse Irving Memorial Hospital $1,726.08.

. The court has examined the proposed findings of fact and conclusions of law submitted by the defendant and declines to pass upon them. (See Grace v Corn Exch. Bank Trust Co., 171 Misc 522, mod on other grounds 259 App Div 896, revd on other grounds 287 NY 94, mot for rearg den 287 NY 746.)