Matthew Frank OWENS, a minor, By and Through his guardian ad litem, Kathy J. OWENS, and Kathy J. Owens, individually, Plaintiffs and Appellants,

v.

Eileen GARFIELD, Robert F. Suchyta, M.D., Salt Lake County, and State of Utah, Defendants and Appellees.

No. 870026.

Supreme Court of Utah.

Dec. 29, 1989.

W. Brent Wilcox, Colin P. King, Edward B. Havas, Salt Lake City, for plaintiffs and appellants.

Brad L. Swaner, Salt Lake City, for Garfield.

Stewart M. Hanson, Francis J. Carney, Salt Lake City, for Suchyta.

David E. Yocom, Patricia J. Marlowe, Jerry G. Campbell, Salt Lake City, for Salt Lake County.

R. Paul Van Dam, Linda Lunistra, David J. Schwendiman, Salt Lake City, for State.

DURHAM, Justice:

Plaintiffs appeal the trial court's grant of summary judgment in favor of defendants Salt Lake County and the State of Utah.[1] Plaintiffs argue that (1) the lower court erred in holding that defendants owed no duty to plaintiffs and (2) summary judgment was inappropriate since genuine issues of fact exist. We affirm the decision of the trial court. Neither defendant owed a legal duty to plaintiffs, and therefore no cause of action for negligence lies.

In a case decided on summary judgment, the facts are considered in the light most favorable to the party opposing summary judgment. *Hill v. State Farm Mut. Auto. Ins. Co.*, 765 P.2d 864, 866 (Utah 1988). The recitation of the facts in this case follows that principle.

Eileen Garfield was selected as the daytime babysitter for Matthew Owens by his mother, Kathy Owens. On December 10, 1981, Matthew, then seven months old, was left in Ms. Garfield's care all day and part of the evening. Early the next morning, Ms. Owens discovered that Matthew was ill. He was taken to the hospital, where it was determined that he had sustained numerous injuries. Garfield was subsequently convicted of second degree felony child abuse for the battering of Matthew, who is permanently and seriously impaired, mentally and physically, because of his injuries.

Prior to Garfield's abuse of Matthew, the State, through its Division of Family Services (DFS), and the County suspected Garfield of abusing other children in her care. In 1975, two reports were filed with the DFS against Garfield for suspected abuse. Both incidents were investigated by the Salt Lake County Sheriff's office, and one charge of reckless conduct resulted. In August 1980 and March 1981, two more reports accusing Garfield of child abuse were filed with the DFS. These cases were turned over to the County. Following investigation, the County filed criminal charges against Garfield on July 2, 1981. These charges were pending at the time Matthew was abused by Garfield.

Another investigation, which did not result in criminal charges against Garfield, was conducted in March 1981. The DFS was notified by the parent of a child in Garfield's care of a suspected incident of abuse. The County was notified of this incident, conducted an investigation, and determined, upon the advice of the county attorney, that charges should not be filed. This decision was based on delay in reporting the incident, which prevented accurate documentation of the child's injuries, and uncertainty on the part of the parent and a doctor who examined the child as to whether the injuries were the result of abuse.

The same parent also expressed concern that Garfield was tending too many children and that she was unlicensed. This led to investigatory visits by both the DFS and an officer from the Salt Lake County Sher-

---

**1.** Plaintiffs do not appeal from an order of summary judgment and dismissal in favor of Dr. Robert F. Suchyta. Plaintiffs settled with Eileen Garfield, and the case against her was dismissed.

iff's office. Garfield was warned by the DFS that she would have to reduce the number of children in her care in order not to be in violation of Utah's day-care licensing laws. The laws in effect at that time required anyone caring for three or more children in his or her home to be licensed. Utah Code Ann. §§ 55–9–1 to –5 (Supp. 1981) (repealed 1987; comparable provisions codified at Utah Code Ann. §§ 62A–2–101 to–116 (1989)). She was also advised that she would not be eligible for licensure because of the 1975 child abuse charge. A follow-up visit found Garfield in compliance with the licensing laws.

Plaintiffs argue that the State and the County breached their duty to Matthew Owens by not attempting to prevent Garfield from babysitting prior to Matthew's injuries and by not warning the parents of children in her care about their concerns regarding Garfield. As discussed below, however, we agree with the trial court that neither the State nor the County owed a legal duty to Matthew Owens and therefore could not be found negligent.[2] Because we hold as a matter of law that no legal duty was owed to Matthew Owens by defendants, we do not address plaintiffs' claim that summary judgment was inappropriate because of the existence of genuine issues of material fact.[3]

■ An essential element of a negligence claim is a duty owed by the defendant to the plaintiff. *Beach v. University of Utah,* 726 P.2d 413, 415 (Utah 1986). Traditionally, the common law has not required a defendant to prevent harm when doing so requires that the defendant control the conduct of another person or warn others about such conduct. There are two exceptions to this rule. There is a duty to control the conduct of a third person or warn another of such conduct if

(a) a special relation exists between the [defendant] and the third person which imposes a duty upon the [defendant] to control the third person's conduct, or

(b) a special relation exists between the [defendant] and the other which gives to the other a right to protection [from the third person].

*Hale v. Allstate Ins. Co.,* 639 P.2d 203, 205 (Utah 1981) (quoting Restatement (Second) of Torts § 315 (1964)). Thus, in order to find a duty on the part of defendants to prevent Garfield from babysitting or to warn plaintiffs of problems regarding Garfield, a special relationship must have existed between defendants and Garfield or defendants and Matthew Owens.

■ It is difficult to conceive, and plaintiffs do not attempt to construct, an argument that defendants had a sufficiently close relationship in a legal sense with Garfield to give rise to a duty to control her activities. Although both the DFS and the County had been investigating Garfield, she was not in their custody, she was not under their direct supervision, and she was not required to be licensed by the State to be a day-care provider. Two courts have decided cases where governmental liability was premised on a duty created under the state's day-care licensing statutes. *See,*

**2.** The parties and the trial court devoted considerable time to a discussion of whether the state of Utah recognizes the public duty/private duty doctrine and whether the doctrine of sovereign immunity has been abrogated. The public duty/private duty doctrine (also known as the public duty/special duty doctrine) essentially says that governments owe a general duty of care to the public at large, the breach of which is not actionable. Under the doctrine, the government is only liable if it owes a special duty to the individual plaintiff beyond the general duty owed to the public. *See Ferree v. State of Utah,* 784 P.2d 149 (Utah 1989). We see no need to address this question in this case.

Plaintiffs allege that the Utah Governmental Immunity Act, Utah Code Ann. §§ 63–30–1 to

–38 (1989), abrogates the doctrine of sovereign immunity in Utah and therefore prevents recognition of the public duty/special duty doctrine. Because we hold that *no* duty existed in this case, we do not address the governmental immunity question.

**3.** Plaintiffs claim that the trial court's finding that the DFS and the County fully performed their legal duties presents a genuine issue of material fact. The court's finding, however, did not refer to performance of specific duties owed to plaintiff Matthew Owens, but instead referred to defendants' statutory obligations as a child abuse prevention agency and a law enforcement agency.

*e.g.*, *Andrade v. Ellefson,* 391 N.W.2d 836 (Minn.1986); *Brasel v. Children's Servs. Div.,* 56 Or.App. 559, 642 P.2d 696 (1982). In both of these cases, a duty to prospective users of licensed day-care providers was found under the statute. Garfield was not included in the class of day-care providers required to be licensed under the Utah day-care licensing laws. Because this case does not involve a licensed day-care provider, no duty can be predicated on the licensing provisions.

A more significant relationship between Garfield and defendants than existed here would be required in order to impose a legal duty upon either defendant to take the actions plaintiffs allege they should have taken to control Garfield's activities. *See, e.g., Cansler v. State,* 234 Kan. 554, 675 P.2d 57 (1984) (incarcerated criminal); *Petersen v. State,* 100 Wash.2d 421, 671 P.2d 230 (1983) (confined mental patient); *Division of Corrections v. Neakok,* 721 P.2d 1121 (Alaska 1986) (parolee who had exhibited dangerous tendencies in prison).

■ Plaintiffs focus on the alternative argument that a special relationship existed between defendants and Matthew Owens which created a duty to protect Matthew. They claim that this relationship arose from a statutory duty created by Utah's child abuse reporting statute, Utah Code Ann. §§ 78–3b–1 to –16 (Supp.1981) (repealed and recodified in 1988), *see* note 5, *infra,* as read *in pari materia* with the Federal Child Abuse Prevention and Treatment Act, 42 U.S.C. §§ 5101–5106h (1982). We first address plaintiffs' claim that the terms of the federal statute must be incorporated into our construction of the Utah statute.

The Federal Child Abuse Prevention and Treatment Act deals with appropriation of federal funds for state child abuse prevention and treatment services. It contains guidelines for the states and suggests ten elements to be considered in setting up child abuse prevention and treatment services.[4] However, the statute is not intended to serve as mandatory model legislation. In fact, the regulations promulgated under the statute provide that the "enactment of identical laws and procedures in the states is not necessary." 45 C.F.R. § 1340.3–3 (1981).

Plaintiffs' perception of the role of the federal legislation is incorrect. The court in *Jensen v. Conrad,* 570 F.Supp. 91 (D.S. C.1983), *aff'd,* 747 F.2d 185 (4th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985), interpreted the same federal statute in a case similar to this. *Jensen* dealt with a claim that a child abuse victim had been deprived of a right to life by the failure of the state's department of social services to protect her from abusive parents. One basis for the right alleged by the plaintiffs was the Federal Child Abuse Prevention and Treatment Act. The court held the statute to be a "mere federal-state funding [statute]." *Id.* at 113. The court also noted:

> [The statute] do[es] address by means of federal appropriations, the problem of child abuse and neglect in the individual states. However, the fact that abused children are the indirect recipients of federal largess does not, in and of itself, create enforceable "rights" in the statute itself.

*Id.* at 112 (citation omitted).

The reasoning of *Jensen* is applicable to plaintiffs' argument in this case. The federal statute is a funding statute that suggests how child abuse prevention and treatment programs should be administered. Just as no legal right is created by the aspirational language of the statute, no legal duty arises from it. Although the federal statute does provide some specific requirements for qualification by a state

---

4. The portion of the statute which plaintiffs emphasize is one of the ten elements listed in the statute. It provides that a state should

> provide that upon receipt of a report of known or suspected instances of child abuse or neglect an investigation shall be initiated promptly to substantiate the accuracy of the

report, and, upon a finding of abuse or neglect, immediate steps shall be taken to protect the health and welfare of the abused or neglected child, as well as that of any other child under the same care who may be in danger of abuse or neglect....

42 U.S.C. § 5103(b)(2)(C) (1982).

program for federal funding, those requirements are irrelevant to the issues in this lawsuit, and there is no evidence to suggest that Utah's statute does not meet those requirements. The Utah statute need not be read *in pari materia* with the federal statute, therefore, but should be read independently to determine whether it created a statutory duty on the part of defendants to protect Matthew Owens.

■ The Utah statute provides guidelines for the investigation of child abuse and the protection of child abuse victims.[5] The statute requires that the DFS make an investigation upon receiving an oral or a written report of suspected abuse. The question before us is whether a duty arose on the part of the DFS to prevent the abuse of Matthew Owens under the statute.

Plaintiffs argue that such a duty did arise since Matthew was part of a class of persons intended to be protected under the statute—children. The purpose of the Utah statute is

> to protect the best interests of children, offer protective services to prevent harm to the children, stabilize the home environment, preserve family life whenever possible, and encourage cooperation among the states in dealing with the problem of child abuse.

Utah Code Ann. § 78–3b–1 (Supp.1981). Although the statute is intended to address the problem of child abuse, we are not persuaded that it can be read to create a legally enforceable duty on the part of the DFS to protect all children from child abuse in all circumstances. Such a duty would be impossible to perform. The statute sets up procedures to be followed by DFS employees when they are alerted of suspected abuse of identified children, but it does not create a duty on the part of the

DFS to protect children who are never identified as being in need of protection.

Several courts have faced claims involving governmental liability in child abuse cases. *See, e.g., Turner v. District of Columbia,* 532 A.2d 662 (D.C.App.1987); *Sorichetti v. City of New York,* 65 N.Y.2d 461, 482 N.E.2d 70, 492 N.Y.S.2d 591 (1985); *Mammo v. State,* 138 Ariz. 528, 675 P.2d 1347 (Ct.App.1983). Although none of these cases presents facts identical to those in this case, the reasoning is instructive. In *Mammo v. State,* for example, a case relied upon by plaintiffs, the father of a homicide victim brought a wrongful death action against the state of Arizona and its Department of Economic Services (DES) for failing to adequately protect his child from abuse by the child's mother and her boyfriend. The father reported to the police and the DES his concerns for the child's safety. The DES took no action except to recommend that the father challenge the mother's custody of the child. Four days before the scheduled custody hearing, the child died at the hands of either the mother or the boyfriend. The father alleged that the state and the DES owed a duty to the child under the Arizona child abuse prevention statute, a statute comparable to the Utah statute at issue in this case. *See* Ariz.Rev.Stat.Ann. § 8–546.01 (1989).

The Arizona court found that the Arizona statute was "clearly for the protection of threatened individuals." *Mammo,* 138 Ariz. at 532, 675 P.2d at 1351. After the child was "individually identified to the agency charged with her protection," the court held, "a relationship emerged between her and the state so that the failure on the part of the DES employees to perform their duty worked a special injury to her." *Id.* (citation omitted). The court found that because a duty arose on the part of the DES to protect the identified

5. Utah Code Ann. § 78–3b–8(1) (Supp.1981) provided: "The division shall make a thorough investigation upon receiving either an oral or written report. The primary purpose of the investigation shall be the protection of the child." This section has been amended four times since the present case arose to more clearly outline the types of abuse to be investigated ■

and to add a requirement of reasonable cause to suspect abuse before an investigation must be conducted. However, these amendments do not affect our analysis of the statute, and the outcome of this case would be the same under the present statute, which has been recodified at Utah Code Ann. § 62A–4–509(1) (1989).

child, the matter was properly submitted to the jury.

The D.C. Court of Appeals heard a similar suit involving a mother's negligence claim against the District of Columbia for failing to remove her children from the home of their abusive father. In *Turner v. District of Columbia,* the negligence claim was based on failure to perform a statutory obligation under the D.C. child abuse prevention statute, comparable to Utah's statute. *See* D.C.Code Ann. §§ 6–2102, 6–2121(a), 6–2122(a), (c), (e) (1989). In *Turner,* the mother repeatedly reported suspected abuse and neglect of two of her children who were living with their father to the D.C. Child Protective Services. The agency failed to promptly investigate the report. The father's probation officer later found one child dead and the other severely neglected.

Overturning a grant of summary judgment in favor of the District, the court found that the D.C. child abuse prevention statute created a duty which was "quite narrow and specific, created by statute to benefit a precisely defined class of persons: abused and neglected children who have been individually identified to the government agency charged with their protection." *Turner,* 532 A.2d at 673.

We find the reasoning of the *Mammo* and *Turner* courts highly persuasive in our consideration of the Utah statute. The Utah child abuse prevention and treatment statute, like the Arizona and D.C. statutes, creates a duty on the part of the State and the DFS to protect children who are identified to them as suspected victims of child abuse. Unfortunately, however, unlike the victims in *Mammo* and *Turner,* Matthew Owens was never individually identified to the DFS, nor did the DFS have any legal duty to discover his identity under the circumstances of this case. The DFS was never notified of any suspected abuse of Matthew Owens prior to the incident in question here. Therefore, no duty arose under the Utah statute to protect him.

Plaintiffs argue that identification of the specific victim is not essential to the existence of a duty, citing three cases for this proposition. *Irwin v. Town of Ware,* 392 Mass. 745, 467 N.E.2d 1292 (1984); *Huhn v. Dixie Ins. Co.,* 453 So.2d 70 (Fla.Dist.Ct. App.1984); *Florence v. Goldberg,* 44 N.Y.2d 189, 375 N.E.2d 763, 404 N.Y.S.2d 583 (1978). *Huhn v. Dixie Insurance Co.* was disapproved by the Florida Supreme Court in *Everton v. Willard,* 468 So.2d 936 (1985). While we agree that the holdings in *Irwin* and *Florence* may have merit, we note that they are distinguishable factually from the instant case and are therefore inapplicable. *Irwin v. Town of Ware* involved claims by injured plaintiffs brought against a municipality for failure to detain an intoxicated driver who later collided with the automobiles of the plaintiffs. Although the victims were not identified at the time the duty was breached, the police had been in lawful control of a dangerous person whom they negligently released from that control. It was the element of control over the intoxicated driver that created the duty to protect potential victims. As noted above, neither the State nor the County in this case had the legal right to control Garfield at the time of Matthew's injuries, and therefore, they owed no duty to unidentified potential victims of her actions.

*Florence v. Goldberg* involved a child who was struck by a taxicab while returning from school. A claim was brought against the New York Police Department for failing to provide a crossing guard at the intersection on the day of the accident. The police department had assigned a crossing guard to the intersection for two weeks prior to the accident. During those two weeks, the child's mother had accompanied the child to the intersection daily. On the day of the accident, the mother did not accompany her child. The crossing guard had called in sick that day, and the police department failed to post another guard or notify the school principal. The court found New York City liable for failing to adequately perform its duty even though the child was not individually identified to the police department.

The instant case is very different factually from *Florence v. Goldberg.* The duty in

*Goldberg* had been voluntarily assumed, and there was deliberate and justified reliance on the part of the mother who decided not to accompany her child to school, believing that a crossing guard would be at the intersection. There was no voluntary assumption of a duty in Matthew's case and no reliance or basis for reliance by plaintiffs.

Child abuse is a problem of enormous proportions and terrible implications. We, like other citizens of this state, are appalled by the facts of this case. Serious injuries have been inflicted on a young child by his unlicensed caretaker, and his parents are now terribly burdened by the obligations of caring for a severely handicapped child. In the absence of a legislatively imposed duty of licensure or supervision of day-care providers like Eileen Garfield, however, no liability may be imposed on public entities for failure to supervise and warn. Likewise, there is no common law basis for the imposition of a duty on the State or the County to prevent Garfield from babysitting or to warn Matthew's parents about their concerns regarding Garfield.

The trial court's summary judgment in favor of defendants is affirmed.

STEWART, J., concurs in the result.

ZIMMERMAN, Justice (concurring specially):

I concur in the opinion of Justice Durham, except that portion suggesting in dictum that if Matthew Owens had been individually identified to defendants as a potential victim of abuse, then plaintiffs could rely on the Utah child abuse prevention and treatment statute as creating a legal duty to take steps to protect him. At this point, I think it premature to speculate as to whether and when we might find the statute to create a duty upon which a tort action could be founded. *See, e.g., Beach v. University of Utah*, 726 P.2d 413 (Utah 1986) (discussion of factors to be considered before tort duty is implied); *Christensen v. Hayward*, 694 P.2d 612 (Utah

1984) (per curiam) (discussion of public/private duty dichotomy).[1]

HALL, C.J., and HOWE, Associate C.J., concur in the concurring opinion of ZIMMERMAN, J.

---

1. This position represents the view of the majority of the Court on this issue.