**Melinda ROLLINS, personal representative of the Estate of Marcel Schopf, and Royal Insurance Company, Plaintiffs and Appellants,**

v.

**Jon Michael PETERSEN, Dale R. Brown, Susette A. Brown, and State of Utah, State Hospital, Defendants and Appellees.**

No. 880280.

Supreme Court of Utah.

June 5, 1991.

Robert M. McRae, Harry H. Souvall, Vernal, for Melinda Rollins.

R. Paul Van Dam, Stephen J. Sorenson, Salt Lake City, for the state.

Robert L. Jeffs, Provo, for the Browns.

ZIMMERMAN, Justice:

The Estate of Marcel Schopf (the estate) brought this wrongful death action against the State of Utah, the Utah State Hospital (the hospital), Dale R. and Susette A. Brown, and Jon Michael Petersen. The trial court granted summary judgment in favor of the hospital and the Browns. We affirm.

On appeal from an order granting summary judgment, we view facts and inferences in the light most favorable to the losing party. *See, e.g., Beach v. University of Utah,* 726 P.2d 413, 414 (Utah 1986). We recite the facts accordingly. *State v. Verde,* 770 P.2d 116, 117 (Utah 1989).

Jon Michael Petersen was admitted to the hospital in May of 1982, having been admitted on four previous occasions. His diagnosis was schizo-affective disorder, and his commitment to the hospital has since been renewed continuously by the fourth district court. Petersen's admission in 1982 resulted from an incident in which he held hostage and stabbed his roommate. His history at the hospital shows that he is quick to anger and is sometimes verbally abusive, but that he does not stay angry, bear grudges, or become physically aggressive. His hospital record includes two escapes: an AWOL in September of 1983, and a "walk away" from a halfway house in March of 1985.

Petersen had been assigned to the hospital's adult unit 11, a locked ward. Prior to November 1, 1986, Petersen's treatment team had given him a blue "self-escort" pass. Holders of blue passes at the hospital have the privilege of leaving the ward without supervision for a period not to exceed an hour and fifteen minutes, during which they may buy snacks, use pay phones, walk the grounds, etc. When the holder of a blue pass leaves the locked ward, the required procedure is that the patient "sign out," i.e., inform the ward attendant of the time the patient leaves, the patient's expected destination, and a description of the patient's clothing. A patient who has not returned within five minutes of the expected time is considered a "potential AWOL," and the staff takes measures to locate the patient.

Patients at the hospital also have certain "industrial" duties. Petersen's assigned industrial duty was to return lunch trays used in the ward to the kitchen on another floor. He requested and was granted permission to waive the sign-out requirement when he left the ward regularly for this specific purpose.

On the morning of November 1, 1986, Petersen refused several requests to get out of bed and take his medication. Thus, by the time he did comply, his privileges had been revoked for the day. After lunch, between 12:15 and 12:30 p.m., Petersen left the ward to return lunch trays in accordance with his industrial assignment. He did not sign out. He then left the hospital grounds entirely and, finding the Browns' unattended automobile with its engine running on a nearby residential street, stole the car and drove away. Some minutes later (and approximately an hour after leaving the hospital), as he attempted to evade police on Interstate 15, Petersen lost control of the car, crossed into the path of oncoming traffic, and collided head-on with another vehicle, killing Marcel Schopf.

Schopf's estate brought suit against the Browns, alleging that they negligently failed to secure their automobile and that Schopf's death proximately resulted. The estate also alleged that the hospital was negligent in failing to comply with its established policies, in allowing Petersen to walk away from the facility, and in not adequately instituting its own AWOL procedures to recover him. The trial court granted summary judgment for the Browns and the hospital on the ground that neither owed a duty of care to Schopf. The court also granted summary judgment in favor of the hospital on the alternative ground of governmental immunity. On appeal, the estate argues that summary judgment was improperly granted for the Browns and the hospital. It argues that section 41–6–105 of the Code, which requires owners of cars to secure their vehicles when left unattended, creates a duty owed by the Browns to Schopf. The estate

also contends that under the Restatement, the hospital owed a duty to Schopf as well.

Summary judgment is appropriate only when there exists no genuine issue of material fact and the moving party is entitled to judgment as matter of law. Utah R.Civ.P. 56(c); *see, e.g., Landes v. Capital City Bank,* 795 P.2d 1127, 1129 (Utah 1990); *Utah State Coalition of Senior Citizens v. Utah Power & Light Co.,* 776 P.2d 632, 634 (Utah 1989). We accord no deference to the trial court's conclusions of law, reviewing them for correctness. *Landes,* 795 P.2d at 1129; *Madsen v. Borthick,* 769 P.2d 245, 247 (Utah 1988).

We first consider the estate's claim that the trial court erred in finding that no valid cause of action for negligence had been alleged against the hospital because it owed the decedent no duty of care. As we stated in *Beach v. University of Utah,* 726 P.2d 413 (Utah 1986), "One essential element of a negligence action is a duty of reasonable care owed to the plaintiff by defendant.... Absent a showing of a duty, [the plaintiff] cannot recover." *Beach,* 726 P.2d at 415 (citing *Hughes v. Housley,* 599 P.2d 1250, 1253 (Utah 1979); *Williams v. Melby,* 699 P.2d 723, 726 (Utah 1985)); *accord Ferree v. State,* 784 P.2d 149, 151 (Utah 1989). In *Beach* and our recent decision in *Ferree,* we found that the relationship between the allegedly negligent institution and the plaintiff was not such that a duty of care was owed. In both cases, we affirmed summary judgment for the institutions.

In the present case, the hospital argues that *Ferree* controls and that it owed no duty to protect the decedent from Petersen. In *Ferree,* a patient was released from a corrections center for the weekend. While on release, he murdered Dean Ferree. We upheld a grant of summary judgment for the corrections center, finding that the center owed no duty of care to Ferree, a member of the public at large. *Ferree,* 784 P.2d at 153. Plaintiffs here argue that *Ferree* is factually distinguishable. They urge that we follow the Restatement of Torts' criteria for determining when a duty is owed to third persons by a custodian who has taken control of the one causing injury. Under these criteria, plaintiffs argue, the hospital should be found to owe a duty to the decedent.

We acknowledge the general applicability in Utah of the "special relation" analysis described in sections 314 through 320 of the Restatement of Torts. *See generally* Restatement (Second) of Torts §§ 314–320 (1965). A brief review of that concept will assist in understanding our disposition of plaintiffs' claim under section 319. Section 315 sets out the general tort principle that one has no duty to control the conduct of third persons. The Restatement then lists two exceptions to this general rule. First, if "a special relation exists between the actor and the third person," then the actor has a duty to "control the third person's conduct." Restatement (Second) of Torts § 315 (1965). Second, if "a special relation exists between the actor" and the plaintiff, the plaintiff has "a right to [the actor's] protection," presumably against harm from third persons. *Id.*[1]

These two exceptions are given more detailed explanation in sections 319 and 314 respectively of the Restatement. Section 319 states:

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

Restatement (Second) of Torts § 319. Section 314A attempts to define some of the

---

1. Section 315 provides:
   There is no duty so to control the conduct of a third person as to prevent him [or her] from causing physical harm to another unless
      (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
      (b) a special relation exists between the actor and the other which gives to the other a right to protection.
   Restatement (Second) of Torts § 315 (1965). *See generally Owens v. Garfield,* 784 P.2d 1187, 1189 (Utah 1989); *Hale v. Allstate Ins. Co.,* 639 P.2d 203, 205 (Utah 1981).

circumstances that create a special relation between the actor and the plaintiff.

(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his [or her] normal opportunities for protection is under a duty [to protect] the other [against unreasonable risk of physical harm].

Restatement (Second) of Torts § 314A(4) (1965). Thus, section 314A is concerned with imposing a duty on the custodian to protect the detainee from harm, while section 319 attempts to define when the custodian has a duty to employ reasonable care to prevent a detainee from harming others.

Under the Restatement analysis, then, the critical question is whether a special relation exists that would give rise to a duty upon which liability could be based. Our recent cases of *Beach* and *Ferree* have dealt with the existence of a special relation.

In *Beach v. University of Utah*, 726 P.2d 413 (Utah 1986), we followed the approach of section 314A and analyzed the relationship between the student and the university to determine whether it could be characterized as "special," thereby imposing a duty on the university to protect the student from her own intoxication. In making this determination, we described as essentially pragmatic the approach we would take in dealing with claims that special relationships existed which gave rise to consequent duties:

Determining whether one party has an affirmative duty to protect another ... requires a careful consideration of the consequences for the parties and society at large. If the duty is realistically incapable of performance, or if it is fundamentally at odds with the nature of the parties' relationship, we should be loath to term that relationship "special" and to impose a resulting "duty," for it is meaningless to speak of "special relationships" and "duties" in the abstract. These terms are only labels which the legal system applies to defined situations to indicate that certain rights and obligations flow from them; they are "an

expression of the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection."

*Beach*, 726 P.2d at 418 (citations omitted).

We then reviewed all the relevant factors, including the nature of the modern university, its relationship to its students, and the impact a finding of "special relationship" would have in this context. We concluded that no such relation existed and that the plaintiff was owed no duty to protect her from herself.

This brings us to the recent case of *Ferree v. State*. The claim of the decedent's estate in *Ferree* was, in essence, a claim under the principles of section 319 of the Restatement relied upon by plaintiffs here, another subspecies of the "special relation" duties described generally in section 315 and analyzed in *Beach*. In *Ferree*, we analyzed the relationship of the corrections center to a plaintiff, an otherwise indistinguishable member of the general public, who was killed by an inmate. Although we did not cite section 314, 315, or 319 of the Restatement in disposing of the *Ferree* claims of a special relation, our analysis generally followed the pragmatic approach of *Beach*. For example, in finding that no special relation existed between the institution and the plaintiff and, consequently, that no duty was owed to any members of the public to protect them from dangerous persons released from state custody, we reasoned:

To adopt plaintiffs' theories would impose too broad a duty of care on the part of corrections officers toward individual members of the public. It would expose the state to potentially every wrong that flows from the necessary programs of rehabilitation and paroling of prisoners. Given the increases in prison populations, the effect could well be to burden corrections officials and chill legitimate rehabilitative programs. Parole and probation programs are subject to occasional tragic failures of human nature and the imprecision associated with predicting violent human conduct, but they are also practically indispensable. The public interest

would not be served by imposing liability on corrections officials and the state for the uncertain success that attends parole and probation programs.

*Ferree v. State,* 784 P.2d 149, 151 (Utah 1989).

We concluded in *Ferree* that if the officials had reason to believe that a detainee presented a danger to a particular third person, a special relation, and hence a duty, might be established apart from a generalized duty to protect the public at large. However, we found that no such showing had been made in *Ferree.* Therefore, we affirmed the trial court decision granting the corrections center summary judgment. *See id.* at 152–53.

Returning to the present case, plaintiffs contend that under the language of section 319 of the Restatement, we should find a special relation to exist between the hospital and the public at large and, therefore, impose a duty on the hospital to protect the public at large from allegedly dangerous persons in custody. Because plaintiffs recognize that the claim here is similar to that rejected in *Ferree,* they request that we either distinguish *Ferree* or reject it as inconsistent with section 319. We decline to accept this invitation for essentially the same pragmatic reasons we did not find a special relation and a consequent duty in *Beach* and *Ferree.*

▇▇▇▇ We elaborated on these pragmatic considerations in *Ferree.* They apply equally here. Prisoners are almost always released at some point, and those committed to state hospitals are treated for eventual release. The prison's parole and minimum security programs are designed to give the inmate the best opportunity to successfully become a member of society again. Analogously, the hospital is charged with placing those under its care in the minimum level of secure confinement

consistent with the treatment. *See generally* Utah Code Ann. §§ 62A–12–234(10)(d), –235(2), –241 (1989). Yet both prisoners and patients in the hospital almost definitionally are dangerous to someone. *See* Utah Code Ann. §§ 62A–12–209(2)(d), –232(1)(a) & (b), –234(10)(b) (1989 & Supp. 1990).[2] To find the claimed special relation and the consequent duty would be inconsistent with the performance of the functions assigned to the custodian by the legislature. If these custodians owed a duty to every member of the public for any harm done by a person under their control, the broad potential for liability could effectively cripple these programs. In such settings, we conclude that, in the words of *Beach,* "the duty [proposed] is realistically incapable of performance [and] ... it is fundamentally at odds with the notions of the parties' relationship...." *Beach,* 726 P.2d at 418. Therefore, we adhere to *Ferree* and reject imposition of this duty.

The approach plaintiffs advocate under section 319 would have the anomalous result of making custodians running transitional programs virtual insurers of their services, while leaving the public without any prospect of recovery from the custodian once the inmates or patients are released from custody. Yet some of their former inmates and patients will almost certainly remain or again become dangerous. It strikes us as unsound to place the vitality of transitional programs at risk solely in the interest of finding a solvent defendant responsible for any harm caused by one in custody when custody itself has relatively little correlation to one's dangerousness. All custodial decisions and transitional programs present critical risks to some members of the public, and public acceptance of that risk is part of the legislative policy decision that people who may be dangerous are not to be locked up for

**2.** Section 209 requires dangerousness to self or others before commitment of mentally ill persons who have been found not guilty. Utah Code Ann. § 62A–12–209(2)(d) (Supp.1990). Section 232 requires a showing of dangerousness before one may be temporarily committed on the recommendation of a "responsible person" or a "physician or designated examiner."

Utah Code Ann. § 62A–12–232(1)(a) & (b) (1989). Finally, before involuntary commitment by court order, there must be a showing by clear and convincing evidence that the person to be detained poses a danger to self or others. Utah Code Ann. § 62A–12–234(10)(b) (1989).

life simply because of that potential dangerousness.

The sensible approach is to recognize a duty on the part of the custodian that does not discourage the operation of transitional programs, but requires the custodian to use special care when the one in custody sets him- or herself apart from the others in terms of dangerousness to an identifiable person or persons. At that point, a special relation can be said to arise because the one in custody has sufficiently distinguished him- or herself from the general detained population. This is what we held in *Ferree.*

■ To bring section 319 into harmony with our *Ferree* approach, we must read into section 319 the following limitation. Before any duty is imposed to protect others from bodily harm caused by one under control of the state, the "others" to whom such bodily harm is "likely" and in favor of whom the duty arises must be reasonably identifiable by the custodian either individually or as members of a distinct group. Generally, for a person or group to be reasonably identifiable, the bodily harm caused will be of a type that the custodian knew or should have known the detainee was likely to cause if not controlled. And here we emphasize that the term is "likely" to cause, not "might" cause. *See generally State v. Knight,* 734 P.2d 913, 919–20 (Utah 1987) (discussion of relative degrees of probability). When section 319 is read with this qualification, the duty imposed upon the custodian is narrowed to workable dimensions.

■ We now apply this standard to the facts of the present case as against the hospital. The question becomes whether Schopf was reasonably identifiable by the

hospital either individually or as a member of a distinct group. Viewing the facts in the light most favorable to plaintiffs, we find that he was not. The record is devoid of any evidence to indicate that, as to the hospital, Schopf was in any way distinguishable, either himself or as a member of any distinct group that may be injurable. Rather, Schopf was simply a member of the public, no more distinguishable to the hospital than to any other person. As to the hospital, Petersen had not set himself apart in terms of dangerousness to Schopf personally or to any distinct group of which Schopf was a member. Therefore, the hospital owed no duty to Schopf.

■ The hospital also argues that it is entitled to immunity under the Governmental Immunity Act. *See* Utah Code Ann. § 63–30–1 to –38 (1989). Plaintiffs argue that immunity is waived under section 63–30–10(1). *See* Utah Code Ann. § 63–30–10(1)(a) & (j) (1989). We need not, however, address this argument because we have already determined that the hospital owed no duty to Schopf.[3]

We next consider whether the trial court correctly found that there was no cause of action against the Browns. The estate claimed that the Browns owed a duty to the decedent not to leave their car unattended with the keys in it, that they breached that duty, and that as a consequence Schopf was killed. Plaintiffs base their claim of a duty on the fact that section 41–6–105 of the Code imposes a duty on operators of motor vehicles to turn off the engine, lock the ignition, and remove the key when they leave the car unattended. *See* Utah Code Ann. § 41–6–105 (1988).

Section 41–6–105 provides:

**3.** Contrary to assertions in Justice Durham's dissenting opinion, the legislature's abrogation of absolute sovereign immunity does not lead to the conclusion that the public duty doctrine has also been abrogated. Legislative recognition of a right to recover from one who has previously been immune from liability for tortious acts cannot logically be read as an elimination of the requirement that before one can recover damages from another, a tort must be proven. There must still be proof of a duty owed to the one claiming injury and a breach of that duty.

Therefore, in the present case, as in any tort case, the proper mode of analysis is to first consider whether there is a legal theory upon which suit can be brought (in this case, whether the hospital owed a duty to Schopf) before considering the separate and independent questions of whether the hospital is immune. *See Ferree v. State,* 784 P.2d 149 (Utah 1989); *Beach v. University of Utah,* 726 P.2d 413 (Utah 1986). *But cf. Doe v. Arguelles,* 716 P.2d 279 (Utah 1985) (considering governmental immunity question first).

No person driving or in charge of a motor vehicle shall permit it to stand unattended without first stopping the engine, locking the ignition and removing the key, placing the transmission in "park" or the gears in "low" or "reverse" if the vehicle has a manual shift, or effectively setting the brakes thereon; and, when standing upon any perceptible grade, turning the front wheels to the curb or side of the highway.

Utah Code Ann. § 41–6–105 (1988). Violation of this provision is a class B misdemeanor. *See* Utah Code Ann. § 41–6–12 (1988). Plaintiffs reason that under section 286 of the Restatement (Second) of Torts, such a legislative declaration of policy establishes the standard of care owed a decedent. The Browns admit to violating section 41–6–105. Therefore, the question is whether we should view the requirement of section 41–6–105 as establishing a tort duty owed to any person who might be injured in an accident involving one who steals a car as a result of the statute's violation.

Section 286 of the Restatement lists circumstances under which it is appropriate for a court to adopt a statutory standard of conduct as that of a reasonable person and to impose a tort duty to act toward a person in accordance with that standard:

The court may adopt as the standard of conduct of a reasonable [person] the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part

(a) to protect a class of persons which includes the one whose interest is invaded, and

(b) to protect the particular interest which is invaded, and

(c) to protect the particular interest against the kind of harm which has resulted, and

(d) to protect that interest against the particular hazard from which the harm results.

Restatement (Second) of Torts § 286(a)-(d) (1965).

On the other hand, section 288 of the Restatement lists conditions under which courts generally will not impose a tort duty to act in accordance with a legislative standard:

The court will not adopt as the standard of conduct of a reasonable [person] the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively

(a) to protect the interests of the state or any subdivision of it as such, or

(b) to secure to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public, or

(c) to impose upon the actor the performance of a service which the state or any subdivision of it undertakes to give the public, or

(d) to protect a class of persons other than the one whose interests are invaded, or

(e) to protect another interest than the one invaded, or

(f) to protect against other harm than that which has resulted, or

(g) to protect against any other hazards than that from which the harm has resulted.

Restatement (Second) of Torts § 288 (1965).

■ As a general proposition, we agree with the guidelines contained in sections 286 and 288 of the Restatement. *See Christensen v. Lelis Automatic Transmission Serv., Inc.*, 24 Utah 2d 165, 467 P.2d 605 (1970) (violation of statute is negligence in some instances); *Knapstad v. Smith's Management Corp.*, 774 P.2d 1 (Utah Ct.App.1989) (violation of safety statute is negligence only if person injured is member of class to be protected by statute). *See generally Owens v. Garfield*, 784 P.2d 1187, 1193 (Utah 1989) (Zimmerman, J., concurring specially) (agreeing with majority that statute created no tort duty in present case and refusing to speculate as to when such a statute might create duty).

■ However, as guidelines, these sections are only the starting point for our analysis. Under section 286 of the Restatement, relied upon by plaintiffs, before section 41–6–105 can be used as a basis for

imposing a tort duty in favor of the decedent, we must be persuaded that the purpose of the statute was to protect a class of persons of which Schopf is a member and to protect persons such as Schopf against injury or death resulting from a thief's careless operation of the car. Section 41–6–105 does not specify its purpose, nor does it specify that it is intended to protect any particular class of persons. Additionally, nothing in the statute indicates a legislative intent to protect persons such as Schopf against harm resulting from a thief's negligent operation of a stolen car. In the absence of such explicit language, we cannot conclude that the statute was intended to create a duty to the decedent to protect him from the harm which befell him. *See* 57A Am.Jur.2d *Negligence* § 739 (1989); *see also Sellinger v. Freeway Mobile Home Sales, Inc.*, 20 Ariz.App. 238, 511 P.2d 682 (1973) (penal statutes do not create civil cause of action unless expressly stated in statute or clearly implied in legislative intent); *M.H. v. State*, 385 N.W.2d 533 (Iowa 1986) (where statute does not expressly authorize private suits, no cause of action absent legislative intent).[4]

Most jurisdictions with similar statutes also have ruled as a matter of law that these statutes are not intended to impose liability on the owner of a stolen car for injuries to third parties. *See, e.g., Richards v. Stanley*, 43 Cal.2d 60, 271 P.2d 23 (1954) (no duty to protect plaintiff from negligent driving of a thief). Such statutes are read more appropriately as intended to protect the owner and to assist law enforcement. *See* Annotation, *Liability of Motorist Who Left Key in Ignition for Damage or Injury Caused by Stranger Operating the Vehicle*, 45 A.L.R.3d 787 (1972). This view comports well with the language of our statute, which not only requires that the keys be removed, but also that the parking brake be engaged and the wheels turned to avoid an accidental runaway.

Because we do not find that section 41–6–105 is intended to protect those suffering injuries resulting from the careless operation of automobiles by thieves, we hold that section 41–6–105 imposes no duty on the Browns that is actionable by Schopf. *See* Restatement (Second) of Torts § 288(d)-(f) (1965). This holding is in harmony with past cases of this court holding that mere ownership of an automobile does not render the owner liable for the negligent actions of the driver.[5] *See, e.g., Wilcox v. Wunderlich*, 73 Utah 1, 272 P. 207 (1928); *McFarlane v. Winters*, 47 Utah 598, 155 P. 437 (1916).

The trial court's decision granting summary judgment in favor of the hospital and the Browns is affirmed.

HALL, C.J., HOWE, Associate C.J., and STEWART, J., concur.

DURHAM, Justice (concurring and dissenting):

I concur with that part of the majority opinion concluding that there was no cause of action against the Browns. I dissent, however, from the conclusion that the trial court properly granted summary judgment for the hospital on the duty question. The

---

**4.** This court has previously held, "[As] a general rule, violation of a standard of safety set by statute or ordinance is prima facie evidence of negligence." *Hall v. Warren*, 632 P.2d 848, 850 (Utah 1981); *see also Gaw v. State*, 798 P.2d 1130, 1133–34 (Ct.App.1990). However, as the Restatement explains, before violation of a legislative standard will be held to be negligence per se (or prima facie evidence of negligence), the legislative standard must first be "adopted by the court as defining the standard of conduct of a reasonable [person]." Restatement (Second) of Torts § 288B (1965); *see also Hall*, 632 P.2d at 850 n. 1. The question here presented is not whether violation of a safety statute is negligence per se or prima facie evidence of negligence, but rather the preliminary question of whether the legislative standard imposes a duty recognizable in tort as the standard of a reasonable person.

**5.** This court also has held that knowingly entrusting one's car to an incompetent driver may result in liability to the owner. *See Mugleston v. Glaittli*, 123 Utah 238, 258 P.2d 438 (1953). However, leaving the keys in the ignition of an unattended car, while perhaps making theft of the car foreseeable, certainly is not knowing entrustment of the car to an incompetent driver. *See generally Richards v. Stanley*, 43 Cal.2d 60, 271 P.2d 23 (1954) (no duty to protect plaintiff from negligent driving of a thief).

majority holds that there is no valid cause of action for negligence against the hospital because it had no duty of care. I think we should hold that plaintiffs *have* established the existence of a special relationship and a duty on the part of the hospital.

In the past, this court has stated, "One essential element of a negligence action is a duty of reasonable care owed to the plaintiff by defendant." *Beach v. University of Utah*, 726 P.2d 413, 415 (Utah 1986). Traditionally, a government tort-feasor has been accorded a special status with regard to the duty question. Under the public duty doctrine, liability against a government for torts committed against an individual must be premised on the violation of a special or particular duty owed the individual plaintiff rather than on the violation of a general duty owed the public as a whole. Under the doctrine, a duty to all is a duty to none.

Several times since the legislature's enactment of the Utah Governmental Immunity Act, Utah Code Ann. §§ 63-30-1 to -38 (originally enacted under 1965 Utah Laws ch. 139, §§ 1-37), this court has restated its acceptance of the public duty doctrine. In *Obray v. Malmberg*, 26 Utah 2d 17, 484 P.2d 160, 162 (1971), for example, the court held that damages arising from a sheriff's failure to investigate a burglary were not "pursuable by an individual since the public official's duty is to the public...." In *Christenson v. Hayward*, 694 P.2d 612 (Utah 1984), deputies stopped but did not arrest an intoxicated motorcyclist. The motorcyclist was subsequently killed when he failed to negotiate a curve. Specifically rejecting the trend to the effect that "public employees should be held liable for their tortious acts to the same extent as private persons," this court (in a per curiam opinion) held that there was no action for compensable damages because the police had no duty of care toward the individual over and above a general duty to the public. *Id.* at 612-13.

Most recently, in a unanimous opinion in *Ferree v. State*, 784 P.2d 149 (Utah 1989), we concluded that corrections officials were not liable to the family of a victim killed by an inmate on weekend release from a halfway house. This court held that in order to establish an action in tort against a governmental entity, there must be a particular duty owed the plaintiff as an individual rather than a violation of a general duty owed to the public at large. *Id.* at 151. We noted that the adoption of a duty toward the public in general "would impose too broad a duty of care on the part of corrections officers toward individual members of the public." *Id.*

The public duty doctrine is probably still followed in a majority of states. *See Leake v. Cain*, 720 P.2d 152, 158 (Colo. 1986), and cases cited therein. There is, however, a recent trend to reject the doctrine in light of legislative abrogations of sovereign immunity. *See, e.g., Adams v. State*, 555 P.2d 235, 241-42 (Alaska 1976); *Ryan v. State*, 134 Ariz. 308, 656 P.2d 597, 598-99 (1982); *Leake*, 720 P.2d at 158; *Commercial Carrier Corp. v. Indian River County*, 371 So.2d 1010, 1016 (Fla.1979); *Brennen v. City of Eugene*, 285 Or. 401, 591 P.2d 719, 725 (1979); *Coffey v. Milwaukee*, 74 Wis.2d 526, 247 N.W.2d 132, 139 (1976). At least one court has held that the public duty doctrine and the concept of sovereign immunity exist independently, *see J & B Dev. Co. v. King County*, 100 Wash.2d 299, 669 P.2d 468, 471-72 (1983), but the rationale for that result is not persuasive. "[W]hether or not the public duty rule is a function of sovereign immunity, the effect of the rule is identical to that of sovereign immunity. Under both doctrines, the existence of liability depends entirely upon the public status of the defendant." *Leake*, 720 P.2d at 160; *see also Chambers–Castanes v. King County*, 100 Wash.2d 275, 669 P.2d 451, 461 (1983) (Utter, J., concurring in the result) ("The public duty doctrine is in reality merely a not so subtle and limited form of sovereign immunity.").

Those courts repudiating the doctrine determine the government's duty on the basis of general common law principles of duty as applied in actions between private individuals. *See* Annotation, *Modern Status of Rule Excusing Governmental Unit from Tort Liability on Theory that Only*

*General, Not Particular, Duty Was Owed under Circumstances*, 38 A.L.R.4th 1194 § 4 (1985 & Supp.1990). Liability is therefore determined without regard to a defendant's governmental status.

In the past, the public duty doctrine has been defended by two rationales: (1) protecting against excessive governmental liability, and (2) avoiding interference in the governing process. *Adams*, 555 P.2d at 242; *Leake*, 720 P.2d at 158; *J & B Dev.*, 669 P.2d at 473. It has been argued that those justifications are the same as the defenses used in support of sovereign immunity and that they lost any persuasiveness when absolute sovereign immunity was abrogated. *Ryan*, 656 P.2d at 599; *Chambers–Castanes*, 669 P.2d at 460 (Utter, J., concurring in the result). Some courts opine that any fear of excessive governmental liability is dispelled by the fact that, even with the rejection of the public duty doctrine, a plaintiff must still establish a duty on the part of the government under conventional tort principles of foreseeability. *Adams*, 555 P.2d at 242; *Leake*, 720 P.2d at 160. The number of potential plaintiffs is further limited by requirements of proof of proximate cause. *Id.* Moreover, where it is necessary to spread losses, insurance can be acquired by governmental entities in the same manner as it is used by private parties. *Chambers–Castanes*, 669 P.2d at 461 (Utter, J., concurring in the result). Nor would there be undue interference with the governing process and governmental decision making. Even without the public duty doctrine, public officials continue to enjoy qualified immunity and the protections of governmental immunity statutes. *Adams*, 555 P.2d at 242; *Leake*, 720 P.2d at 160.

An additional problem with the public duty doctrine is that it creates confusion in the law and inequitable results. *J & B Dev.*, 669 P.2d at 475 (the doctrine "unnecessarily injects confusion into the law, for the existence of a special 'doctrine' for one type of defendant implies some different analysis is to be applied in such cases"); *Leake*, 720 P.2d at 159 (finding this "the most persuasive reason" for the abandonment of the doctrine). This confusion is created, in part, by the imposition of a judicially created doctrine in an area where the legislature has acted. In light of developments in tort reform and the increasing rejection or limitation of absolute sovereign immunity, I am persuaded that we should reconsider the continued application of the public duty doctrine.

Section 63–30–4 of the Utah Governmental Immunity Act establishes that where governmental immunity is statutorily waived, "liability of the entity shall be determined as if the entity were a private person." Imposing the public duty doctrine over and above this statutory declaration creates immunity where the legislature did not intend it. *Adams*, 555 P.2d at 242. The legislature's willingness to expose governmental entities to liability, as shown by its abrogation of absolute sovereign immunity, deprives the public duty doctrine of the reason for its existence. *Chambers–Castanes*, 669 P.2d at 462 (Utter, J., concurring in the result).

In this case, without the protection of the public duty doctrine, the hospital would be subject to the same duty as a private individual. Plaintiffs would be entitled to establish that a duty was created by virtue of a special relationship under section 315 of the Restatement (Second) of Torts. Even if a majority of this court is unwilling at this time to abandon the public duty doctrine, the court should at a minimum recognize an exception to the doctrine where a special relationship is established between the governmental entity and the *third person* (not the victim member of the public). Whether we eliminate the public duty doctrine or recognize an exception to it, a closer scrutiny of the special relationship concept is necessary.

Section 315 of the Restatement (Second) of Torts lists two exceptions to the general tort principle that an actor has no duty to control the conduct of third persons. Under that section, such a duty is created if a "special relation" exists between the actor and the third person *or* between the actor and the plaintiff. Restatement (Second) of Torts § 315 (1965). In considering the government's duty to control the conduct of third persons, this court has already applied a "special relationship" exception to the public duty doctrine under the second

part of section 315, focusing on whether a duty is owed to the individual plaintiff as distinguished from the public at large. *See Beach,* 726 P.2d at 418 (outlining the factors to be considered in determining whether a plaintiff has a special relationship with the government entity); *Ferree,* 784 P.2d at 152 (government officials may be liable if they have "good reason to believe that a particular person [the plaintiff] may be jeopardized by the release of a prisoner who has demonstrated capacity for violence ...."). The majority concludes, and I agree, that there is no "special relation" established in this case between the hospital and *Schopf.* The majority, however, overlooks the language of the first part of section 315. Under that part, we also must determine whether there is an exception to the public duty doctrine because the hospital formed a special relation with *Petersen.* Simply because this court has never looked at the public duty doctrine in the context of the first part of section 315 does not mean that we should now ignore its language.

Section 319 of the Restatement gives a more detailed explanation of the duties described in section 315 with regard to the custody of "persons having dangerous propensities":

> § 319. Duty of Those in Charge of Person Having Dangerous Propensities
>
> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

Contrary to the majority's reasoning, the key to this duty is not the supervising individual's relationship with the *potential victim,* but rather it is the relationship with the *person in custody.* The duty extends to the protection and safety of those "others," whether a class or an individual, who are foreseeably endangered.[1] *Sterling v.*

*Bloom,* 111 Idaho 211, 723 P.2d 755, 769 (1986). Where a confinement is in the nature of restraint, "there is both a duty to the inmate [patient] to provide him with reasonable rehabilitational conditions under the circumstances and to the outside public to restrain the dangerous, or potentially dangerous, so that they may not harm others." *Williams v. State,* 308 N.Y. 548, 127 N.E.2d 545, 549 (1955). Section 319, which the majority purportedly follows, clearly establishes a duty when there is a special relation between a defendant and a third person.

The majority argues that imposing a duty on the hospital in this case would jeopardize all "transitional" programs designed to assimilate recovering inmates and patients back into the community. The majority's arguments ignore two significant facts unique to this case: (1) At the time of the incident, Petersen was not off the hospital premises on any kind of an authorized conditional or temporary release; he was not in a "transitional" program designed to ease his reentry into the community. (2) Although the hospital's decision to place Petersen in a less restrictive environment within the confines of the hospital grounds may have been discretionary, its failure to follow its own written policies and to enforce its own rules in locating an escaped patient was neither discretionary nor policy oriented.

Petersen was committed to the hospital under court order because he was mentally ill. By definition, therefore, he was a "dangerous" person. Utah Code Ann. § 62A–12–209(2)(d) (Supp.1990). In assuming the custodial and legal care of Petersen, the hospital acquired a duty under section 319. Petersen was admitted to the hospital as a full-time inpatient. The hospital's duty, pursuant to the court order, was to keep him in a secured 24–hour setting. *Within that secured setting,* Petersen was transferred to a less strict type of custody because of the improvement in his behav-

---

1. The majority limits the duty under section 319 to those plaintiffs "reasonably identifiable" as individuals or members of a "distinct group." If read broadly, this definition could include those "foreseeably endangered" under my understanding of section 319. As the majority's

analysis of the facts of this case shows, it results in a narrow reading of the definition. Again, the majority places too much emphasis on the duty owed to the victim rather than the duty owed to the third person "detainee."

ior. *He was not given permission to leave the premises.* He was not, as the majority implies, on parole or in a minimum security or "transitional" program as was the case in *Ferree,* 784 P.2d 149 (weekend release from prison), and *Doe v. Arguelles,* 716 P.2d 279 (Utah 1985) (community placement from youth detention center).

There are allegations and evidence in the record that Petersen had a history of escape, violence, and unpredictability. His hospital record includes two escapes from supervision, the first an AWOL in September 1983, and the second a "walk away" from a halfway house in March 1985. At the time of the incident, Petersen was still a potential AWOL risk. The decision to permit him to routinely leave the ward without signing out, to return dishes as part of his regular therapeutic program, is similar to the kind of release decisions we have characterized as discretionary functions. *See Doe,* 716 P.2d 279. The hospital's failure to follow its own rules immediately after Petersen's violation of the terms of his work assignment, however, are of a different nature. The hospital has a duty to exercise reasonable care in restraining, supervising, and protecting patients in its care. *See Comiskey v. State,* 71 A.D.2d 699, 418 N.Y.S.2d 233, 234 (1979). This duty includes protecting the patient from causing harm to himself or others and, at a minimum, requires its compliance with its own established rules and policies regarding supervision.

From the time Petersen left the ward until he stole the Browns' car, an estimated thirty to fifty minutes had passed. Hospital ward policy stated that an individual not signed back in within five minutes of his expected time of return is considered a potential AWOL. Established policies permitted Petersen's brief absence from supervision, but those same policies required supervising personnel to monitor and enforce the rules for such absences. By definition, Petersen remained a dangerous person with a history of escape. The decision to ignore his unauthorized absence from the ward was not a "policy" decision—it was an act alleged to be in violation of policy. If plaintiffs can establish at trial that the act was negligent and led to

Schopf's death, recovery should be permitted.